**Joan CAPELLUPO, et al.**

v.

**FMC CORPORATION.**

**Civ. No. 4–85–1239.**

United States District Court,
D. Minnesota,
Fourth Division.

June 19, 1989.

Robert J. Hennessey and Lisa A. Gray, Larkin, Hoffman, Daly & Lindgren, Bloomington, Minn., for plaintiffs.

R. Lawrence Ashe, Jr., Paul, Hastings, Janofsky & Walker, Atlanta, Ga., Barbara Berish Brown and Dennis L. Casey, Paul, Hastings, Janofsky & Walker, Washington, D.C., and Carolyn Chalmers, Leonard, Street & Deinard, Minneapolis, Minn., for defendant.

ROSENBAUM, District Judge.

Plaintiffs claim that defendant FMC and, in particular, its Northern Ordnance Division (FMC/NOD) engaged in intentional destruction of evidence. Plaintiffs seek sanctions against defendant for the conduct alleged. The Court heard evidence concerning the charges on May 1 and 2, 1989.

Having heard and considered the evidence, the Court finds that the defendant and its agents have ordered and participated in the knowing and intentional destruction of documents and evidence. This conduct commenced in October, 1983, and was part of a premeditated effort to subvert the proceedings in the present case. The Court further finds that thereafter, and continuing to and until May 3, 1989, the defendant and its agents have engaged in a conspiracy to lie and disseminate knowing half-truths in an effort to disguise and secrete their wrongful acts. To this end they have twisted and tortured the truth both in depositions and in the proceedings before this Court.

The penalties for these acts will be considered hereafter.

*Facts* [1]

This case arises out of a complaint of employment-related gender discrimination at FMC/NOD. The case was initially commenced by plaintiff Kathy Smith who was thereafter joined by co-plaintiff Joan Capellupo.

During Summer 1983, Smith advised Barbara Jabr, then FMC/NOD Equal Employment Opportunity Manager, that she was "fed-up" with FMC/NOD's gender-based treatment and she was contemplating bringing a class action gender discrimination charge against the company, based upon her experiences and observations. It is clear from the evidence in the hearing

---

1. The facts are complex, but fully documented. The Court deems it necessary to set them forth in some detail. The identity of each actor and what each knew at a given time constitute the ultimate bases on which the Court's determination must hinge.

that Jabr communicated the information to co-worker Don Bauer at FMC/NOD in Minnesota. She also informed Messrs. Nick Derrough and James Renfroe at FMC's corporate headquarters. The information was made known in late August and early September, 1983.

Bauer is an employee at FMC/NOD where he specializes in industrial relations. In 1983, Bauer was manager of employee relations. Derrough is the corporation's coordinator of Equal Employment Opportunity/Affirmative Action (EEO/AA) at FMC's corporate headquarters in Chicago, Illinois. Renfroe is presently retired, but at the time of these events he was a member of the general counsel's staff. Until his retirement in 1986, Renfroe was engaged in corporate labor matters as corporate labor counsel.

The evidence demonstrates that Jabr's concerns about NOD's employment practices were intensified by Smith's threatened employment discrimination complaint. To this end, Jabr directed a memorandum to Renfroe, dated August 30, 1983, which concluded "My largest concern goes beyond all that I have recounted above. It is the possible filing of a class action lawsuit by Paul Sprenger on behalf of Northern Ordnance women." Plaintiffs' exhibit 5.

This concern was particularly acute in light of FMC's recent experience in another gender-based discrimination class action lawsuit in San Jose, California.[2] Derrough and Renfroe were involved in the San Jose litigation. Renfroe testified that the San Jose experience was instructive on the issue of document retention.

The hearing evidence indicated that Jabr's memorandum of August 30, 1983, and its expressed concerns were forwarded through the FMC hierarchy. On September 6, 1983, Renfroe of the Chicago legal department sent a confidential memo to FMC's general counsel, P.J. Head, refer-

ring to "Sex Discrimination Charges." That his memo refers to the Northern Ordnance Division is clear from the fact that the memo bears a handwritten note from Tom Epley, a vice president and general manager at FMC/NOD. Plaintiffs' exhibit 30. Further confirmation of the extent of FMC's concern is exemplified by General Counsel Head's September 6, 1983, calendar notation in which he wrote "NOD sex discrimination claim. Renfroe checking up." Plaintiffs' exhibit 18.

A follow-up entry in Head's calendar, dated September 27, 1983, notes, "Day thinks task force has been set up." Plaintiffs' Exhibit 18. The meaning of the entry was clarified in Head's deposition (plaintiffs' exhibit 46, p. 23, ff. 7–11) in which he made clear the reference is to one Mr. Day, an associate general counsel.[3]

On October 3, 1983, Derrough, Chicago's EEO/AA supervisor, along with labor counsel Renfroe, arrived in Minnesota for a meeting at FMC/NOD the next day, October 4, 1983. Smith's complaints were discussed at the meeting. The meeting was initially attended by Renfroe, Bauer, and a Mr. Johnson, a new employee from FMC corporate. Later, the attendees were joined by Jabr. Still later, and either during the meeting or just subsequent to it, Derrough and Renfroe met with Mark DelVecchio. DelVecchio was, at that time, employed at FMC/NOD as an associate employee relations representative.

The Court finds that during, or very shortly after, the October 4, 1983, meeting, Derrough and Renfroe made the decision to systematically destroy FMC/NOD's documents relating to NOD's employment practices and the employee relations department's personally-held records relating to equal employment opportunity and employee complaints of discrimination. While Bauer does not recall a direct instruction to

---

**2.** Defendant's high degree of concern relating to gender discrimination at FMC/NOD is further evinced by its having convened a "Blue Ribbon" panel in August, 1983, to investigate potential differential treatment and by its initiation of a multiple-regression computer research study in September, 1983, and a separate "Jenrette

Study" of these issues in October or November, 1983 (*see* plaintiffs' exhibit 17, p. 2).

**3.** Jabr testified that on September 27, 1983, she went to Chicago and met with Derrough and Renfroe regarding gender discrimination problems at NOD.

destroy documents at this October 4, 1983, meeting, he testified to his recollection of speaking of Kathy Smith at least in general. He further indicated he recalled discussing getting rid of documents which were not required to be maintained.

Under oath, both Derrough and Renfroe denied making or implementing the document destruction decision at this meeting. The Court finds their denials to be inherently unbelievable. In making this finding, the Court has specifically considered each man's credibility based on the Court's observation of their mein and manner while on the witness stand, the believability of their statements, the array of oral and physical evidence in opposition to their testimony, and the course of events which took place thereafter. With these considerations in mind, the Court rejects their denials.

DelVecchio testified that he met with Derrough and Renfroe on or about October 4, 1983.[4] DelVecchio recalls being instructed by Derrough or Renfroe that he was to collect and destroy FMC/NOD's records relating to EEO/AA. Derrough's recall in this area is instructive and indicative of the studied deception in which he engaged: he claims he did not tell DelVecchio to destroy documents, *per se*, rather, he wanted DelVecchio to see that some documents were retained and others disposed of. DelVecchio is clear in his recollection that the instruction did not come from Bauer, one of the other attendees, but at the same time it is clear, as will be set forth below, that Bauer was well familiar with the document destruction decision.

The October 4, 1983, oral destruction order to DelVecchio was confirmed in writing shortly thereafter by Derrough, who sent a memorandum to DelVecchio designating the documents to be destroyed. Neither Derrough nor DelVecchio, according to the evidence, has retained a copy of this directive. Apparently no copy exists today. DelVecchio recalls, however, that he was to collect and destroy any affirmative action plans and personnel documents personally held in the hands of NOD division heads.

The timing of these events is of significance. DelVecchio met with Derrough and Renfroe on October 4, 1983. He testified that he received the written instructions via Federal Express from Derrough in Chicago. This implies a sense of urgency regarding the commencement of disposal. Derrough does not deny that he sent such instructions, but his files contain no copy of the instructions, a portion of which were hand-written.[5] DelVecchio testified, and the Court finds, that the actual destruction began a few days later.[6] Those days between October 4, 1983, and the commencement of destruction are of import because during their span, FMC's knowledge and understanding of Smith's sex discrimination claim increased.

On October 6, 1983, Bauer wrote a memo under the name of Kathy Smith, mentioning the name of the law firm of "Springer [sic] Olson & Shuts [sic]" and designating "class action." Plaintiffs' exhibit 14. The memo, or at least its content, were known by FMC's higher management. It was acknowledged by Derrough and Renfroe. Head's handwritten diary-calendar note for October 6, 1983, (plaintiffs' exhibit 17) alludes to this communication. In deposition testimony concerning the diary note, he stated "[t]hat would either reference a phone call, which it may have been, that

---

4. The Court notes DelVecchio had originally thought this meeting took place in August, 1983. Subsequent review makes it clear that the date was October 4, 1983.

5. In addition, the document destruction orders to DelVecchio varied from normal FMC retention policy and practice. Derrough testified that he sent DelVecchio a proposed retention policy with handwritten changes—this was a "policy" not yet in force at any of the other FMC plants.

6. DelVecchio testified that he spoke with Jabr to identify appropriate individuals he was to visit to collect these documents. A memo from DelVecchio to Mary Lou Spahn, dated "1/3/84" sheds light on the individuals DelVecchio had visited. Plaintiffs' exhibit 8. Spahn was a new staff person and DelVecchio's memo instructed her on steps to be taken in FMC's continuing "file purging process." Although testimony differed as to the purpose and timing of the memo, it is a clear indicator of the scope of DelVecchio's completion of the destruction mandate.

there were sex discrimination complaints or claims that might be made." Dep., p. 24, ff. 17–20. By October 10, 1983, Head's calendar note is specific: "Charge filed by Sprenger firm." [7] Plaintiffs' exhibit 17.

DelVecchio's destruction work was not accomplished without difficulty. In fact, he had trouble on his first stop, at the office of one William Patterson: when asked for his personal records concerning EEO/AA, Patterson stated he would not comply with this irregular request, saying "this is out of the ordinary." Patterson refused to provide the documents. The logjam was broken when DelVecchio applied to employment relations manager Bauer for help. Bauer, under cross-examination, admitted that after DelVecchio's request for assistance, he spoke to Patterson, who expressed his concerns. Bauer told Patterson that DelVecchio was proceeding under Renfroe's instruction and Patterson could give up the documents for destruction.[8] With this instruction, and Bauer's promise to contact the other division directors, DelVecchio visited not fewer than ten department heads. *See* plaintiffs' exhibit 8. From each he obtained personal office files concerning sex discrimination matters and affirmative action plans. After dutifully removing paper clips and staples, every document was shredded. There is no exact record of what was taken, which precludes meaningful document reconstruction.[9]

The hearing's testimony indicated, and the Court finds, that *at a minimum* FMC destroyed a) historically important affirmative action plans, b) personally-maintained files concerning employee discrimination claims, c) files concerning personal investigations of complaints of discrimination, d) personal records of cases individually and informally conciliated, and e) records of terminations and employee interviews (including resumes).[10] The evidence indicated that many "document boxes" of items were destroyed.[11]

Document destruction continued from early October, 1983, through all of 1984, and beyond. In particular, at a meeting held on or about February 14, 1984, at FMC/NOD, Renfroe instructed Derrough, Epley, and Jabr to destroy documents, including unofficial internal investigation information. All four of these individuals certainly had extensive knowledge of the class action suit by that time. There is no indication that Renfroe's directive was not carried out.[12]

While the vast bulk of document destruction took place in the last quarter of 1983, this behavior continued until the arrival of George Trumble, a new corporate counsel, in March or April of 1985, almost 18 months later. When Trumble arrived, he directed that there be no more document destruction.

FMC, while weaving a fabric of lies concerning its effort to destroy documents, makes a second defense: FMC suggests

---

**7.** This entry refers to a meeting at NOD attended by Head, Renfroe, Derrough, a Mr. Kurby, and a Mr. Holleran.

**8.** While the Court here credits Bauer, the Court notes that Bauer contributed mightily to FMC's efforts to cover up this unseemly work. In his first deposition, Bauer stated unequivocally and under oath that he had not participated in the destruction of documents. Later discovery and cross-examination revealed he had participated in the October 4, 1983, meeting, had directly facilitated DelVecchio's work, as stated above, and when DelVecchio came to Bauer's own office (which Bauer stated he could not recall) Bauer did not deny DelVecchio's recollection that Bauer opened his office desk drawer and said "take it all" or "here it is," after which DelVecchio removed all of Bauer's EEO/AA materials and dutifully took them to the shredder.

**9.** It should be noted that even in this act, FMC deviated from accepted corporate practice for documents which were regularly, and properly, destroyed under FMC policy at that time. Under normal circumstances a "DA–149" form is executed listing the exact nature and identification of regularly destroyed documents.

**10.** Testimony indicated that many of these types of documents had been relevant in the San Jose proceeding.

**11.** A document box appears to be approximately $8\frac{1}{2} \times 11 \times 20''$ in size. The Court notes that such a box would contain many thousands of pages.

**12.** Jabr testified that she destroyed her "unofficial" files.

that while it may have thought Smith would file a gender discrimination complaint, it did not really know this until mid-November, 1983, when FMC actually received Smith's EEOC complaint. Defendant's exhibit 29. Or, as a further fall-back, perhaps FMC did not know until it received Capellupo's complaint in December, 1983. Defendant's exhibit 28. Upon this slippery foundation, FMC constructs the argument that, without the class action pleadings in hand, document destruction was permissible.

The Court rejects this formulation. The Court finds that FMC, from its highest corporate offices down through the entire NOD employee relations department, knew of Smith's claim as well as the fact that she fully intended to assert a class action as early as October 1, 1983.

The Court has delineated, above, facts which conclusively demonstrate that FMC was acutely aware of the prospect of this case on October 6, 1983. Further, FMC general counsel Head's calendar-diary, in an entry dated October 10, 1983, indicated: "NOD sex discrimination, Kathy Smith, complaint filed with State on class basis—informed supervisor, Eric Olson, Sprenger firm." A later entry, on the same day, reads as follows: "Kathy Smith—filed with EEOC who will defer to State, Right to sue letter—90 days; change suggested class, Rule 23." Plaintiffs' exhibit 26.

The Court finds this last entry not only indicates knowledge of an impending class action suit, but further undermines the testimony of Renfroe. By his own admission, Renfroe, a general counsel staff lawyer, was the information conduit to Head, the general counsel. At the evidentiary hearing, Renfroe testified he did not know the case would be a class action, but the Head calendar diary notes make clear the class action information had been conveyed to Head. Lastly, the words "Rule 23" most strongly suggest that the information was conveyed by a lawyer.[13] Renfroe admitted he was experienced in Title VII cases, and

testified that he knew Sprenger was a Title VII class action lawyer.

Derrough began his own investigation of the claim no later than October 12, 1983. Plaintiffs' exhibit 12. In a memo dated October 17, 1983 (plaintiffs' exhibit 7), he reported his efforts to deal with the Smith case.

It is clear Jabr was actively seeking counsel for the defense of the impending suit. Telephone logs, dated September 29, 1983, and October 18, 1983, (plaintiffs' exhibit 53), were maintained by Carolyn Chalmers, one of FMC's outside counsel. The Jabr–Chalmers calls elicited a proposal letter, dated October 20, 1983, from Chalmers' firm, then Pepin, Dayton, Herman, Graham & Getts, alluding to FMC's "need for representation in potential class action employment discrimination litigation," and specifically noting its relationship with the Sprenger, Olson and Schutes law firm. Plaintiffs' exhibit 24.

The Court finds that not later than October 1, 1983, FMC knew well that the Smith case was pending and that it was a matter of great consequence. Further, the Court rejects the sophistry that it was not until the December 28, 1983, charge (defendant's exhibit 30) that defendants knew this was to be a class action and that they could, therefore, destroy documents regarding these matters with impunity.

## I. Propriety of Sanctions

The first determination this Court must make is whether sanctions are warranted. It is axiomatic that the imposition of sanctions for destruction of documents is within the trial court's discretion. *Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 689 (D.C.Cir.1987); *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1205–06 (8th Cir.1982), *cert. denied*, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D.Fla.1987). In matters such as this—which lie beyond

---

13. Rule 23 of the Federal Rules of Civil Procedure governs class action proceedings. Such a notation can relate to nothing other than a class action and would not be generally known to the public.

the scope of Rule 37,[14] Federal Rules of Civil Procedure (Fed.R.Civ.P.)—the Court relies on its inherent power to regulate litigation, preserve and protect the integrity of proceedings before it, and sanction parties for abusive practices. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–67, 100 S.Ct. 2455, 2463–65, 65 L.Ed.2d 488 (1980); *EEOC v. Jacksonville Shipyards, Inc.*, 690 F.Supp. 995, 997 (M.D.Fla.1988); *Telectron*, 116 F.R.D. at 126; *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556 (N.D.Cal.1987); *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 654 F.Supp. 1334, 1363 (D.D.C.1986); *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D.Cal.1984).

■ Purposeful impairment of the opposing party's ability to discover information justifies invocation of these powers. Willful transgressions of discovery procedures, such as this case's document destruction, warrant imposition of sanctions. *Coleman v. Smith*, 814 F.2d 1142, 1145–46 (7th Cir.1987); *Independent Petrochemical*, 654 F.Supp. at 1364; *Wm. T. Thompson Co.*, 593 F.Supp. at 1456; *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 486 (S.D.Fla.1984), *as modified*, 775 F.2d 1440, 1449–54 (11th Cir.1985).

■ Sanctions are appropriately levied against a party responsible for causing prejudice when the party knew or should have known that the destroyed documents were relevant to pending or potential litigation. *National Ass'n of Radiation Survivors*, 115 F.R.D. at 557; *Wm. T. Thompson Co.*, 593 F.Supp. at 1455; *Struthers Patent Corp. v. Nestle Co., Inc.*, 558 F.Supp. 747, 765 (D.N.J.1981); *Bowmar Instrument Corp. v. Texas Instruments, Inc.*, 25 Fed.R.Serv.2d 423, 427 (N.D.Ind. 1977). This tenet is particularly applicable when a party is on notice that documents in its possession are relevant to existing or future litigation, but still abrogates its duty of preservation. *EEOC*, 690 F.Supp. at 998; *Wm. T. Thompson Co.*, 593 F.Supp. at 1455.

The Court finds sanctions to be absolutely appropriate in this case. The conduct of defendant's officers and employees, both in the destruction of documents and in their efforts to disguise their wrongful acts, are charitably described as "outrageous." *Alexander*, 687 F.2d at 1205. They have demonstrated a "deliberate, willful and contumacious disregard of the judicial process and the rights of [the] opposing part[y]." *Carlucci*, 102 F.R.D. at 486. Having destroyed a significant quantity of documents, the exact extent of which is now indeterminable, defendant cannot now claim that the information contained is irrelevant or unimportant. *Alexander*, 687 F.2d at 1205–06. The Court has found, *supra*, that defendant cannot claim its actions were so far in advance of the first word of a potential lawsuit by Smith as to be excusable. *See Struthers Patent Corp.*, 558 F.Supp. at 765.

Defendant's purge was intentionally tailored to make forever unavailable records and documents which defendant knew or should have known would be pertinent to this gender discrimination lawsuit. The Court holds that defendant's senior officials and senior employees were on notice of this potential lawsuit and were acutely aware of its subject. Those individuals reacted by instituting a broad program of document destruction. Given these facts, sanctions are more than appropriate.

## II. Determination of Sanctions

This Court has a broad canvas upon which to paint in determining sanctions. Although Rule 37, Fed.R.Civ.P., does not govern this transgression, the Court may rely on Rule 37 for guidance. *See EEOC,*

---

14. Rule 37, Fed.R.Civ.P., is applicable to the "normal" disputes, delays, or difficulties occurring in civil litigation. Its sanctions are appropriate in instances of a litigant's failure to make or cooperate in discovery. Rule 37 enables a court to punish the litigant who has not responded adequately to discovery requests of an opposing party or to orders of the court compelling discovery. Rule 37 does not, by its terms, address sanctions for destruction of evidence prior to the initiation of a lawsuit or discovery requests. *See EEOC v. Jacksonville Shipyards, Inc.,* 690 F.Supp. 995, 997–98 (M.D.Fla.1988).

690 F.Supp. at 998. The sanctioning power is discretionary. *Davis v. American Jet Leasing, Inc.,* 864 F.2d 612, 614 (8th Cir. 1988); *Alexander,* 687 F.2d at 1205–06; *see Hazen v. Pasley,* 768 F.2d 226, 229 (8th Cir.1985); *Fox v. Studebaker–Worthington, Inc.,* 516 F.2d 989, 993 (8th Cir.1975). Within the Court's grasp is a "spectrum of sanctions," from which the most appropriate may be selected. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 644, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976).

■ The most severe sanction available to the Court is default and dismissal. This is an extreme measure, reserved only for the most egregious offenses against an opposing party or a court. The Court must consider default and dismissal as a last resort if no alternative remedy by way of a lesser, but equally efficient, sanction is available. *See Perkinson,* 821 F.2d at 691; *Adolph Coors Co. v. Movement Against Racism and the Klan,* 777 F.2d 1538, 1542–43 (11th Cir.1985); *Alexander,* 687 F.2d at 1205–06; *Fox,* 516 F.2d at 993; *EEOC,* 690 F.Supp. at 998; *Carlucci,* 102 F.R.D. at 486.

Before a sanction of default and dismissal may be entered, this Court must at least find that (1) defendant acted willfully or in bad faith, (2) plaintiffs were prejudiced by defendant's actions, and (3) alternative sanctions would fail to adequately punish defendant and deter future discovery violations. *Telectron,* 116 F.R.D. at 131. The Court finds that the first two elements of this test have been satisfied: defendant's officers and employees acted intentionally and plaintiffs have been deprived of significant amounts of potentially helpful information.[15] An analysis of alternative sanctions applicable to this matter is necessary before a decision can be made as to the third prong of the test.

Courts have considered and imposed a variety of alternatives to the ultimate sanction of dismissal:

1. A number of courts have incorporated a party's destruction of documents into trial proceedings. Courts have permitted the fact-finder to draw inferences adverse to the document-destroying party. *Alexander,* 687 F.2d at 1205–06; *National Ass'n of Radiation Survivors,* 115 F.R.D. at 557. Similar to this sanction is an adjustment of the level of proof required of the aggrieved party. *EEOC,* 690 F.Supp. at 999; *see Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1418–19 (10th Cir.1987).

2. Another common remedy utilized by courts to punish and deter discovery abuse is imposition of monetary sanctions. Not surprisingly, an award of attorneys' fees and costs is frequently invoked to reimburse an aggrieved party for the price of investigating and litigating document destruction. Parties liable for document destruction have been assessed their opponents' fees and costs for investigating, researching, preparing, and arguing evidentiary motions and motions for sanctions. *National Ass'n of Radiation Survivors,* 115 F.R.D. at 558; *Alexander v. National Farmers' Organization,* 614 F.Supp. 745, 757 (W.D.Mo. 1985); *see Perkinson,* 821 F.2d at 689.

3. A party which has destroyed documents may also be held accountable for the fees and costs of depositions, interrogatories, and supplemental discovery costs associated with willful concealment. *National Ass'n of Radiation Survivors,* 115 F.R.D. at 558.

4. A court may also impose monetary sanctions to rectify unnecessary consumption of its time and resources. *Id.* at 559; *see Olga's Kitchen of Hayward,*

---

**15.** Defendant suggests that because a substantial portion of the destroyed documents are copies, or portions, of Affirmative Action Plans, and it is possible these may be able to be reconstructed, that plaintiffs have not been prejudiced. The suggestion is an insult to the Court. In the first place, any validity it has is based upon the testimony of the defendant's witnesses, several of whom the Court has found to be purposefully

mendacious. Second, at least a portion of the documents related to individual complaints and individual officers of the defendant's views and observations. There is no possibility that these documents can be resurrected. Such information is unquestionably of value in a class action case where anecdotal evidence may well amplify or illustrate a broad class-wide allegation.

*Inc. v. Papo,* 108 F.R.D. 695, 711 (E.D. Mich.1985); *Itel Containers Int'l Corp. v. Puerto Rico Marine Management, Inc.,* 108 F.R.D. 96, 106 (D.N.J.1985).

After considering the available alternatives, the Court declines to summarily enter default judgment. This is a significant case and there remains other evidence concerning FMC's liability, if any. Notwithstanding defendant's document destruction, it appears plaintiffs have not been wholly deprived of the means to attempt their proof.

■ Defendant, however, will not be allowed to escape unpunished. The actions of defendant's officers and employees have imposed an enormous burden on counsel for plaintiffs. Had defendant not destroyed the records at issue, counsel for plaintiffs could have focused their efforts on their case in chief. Defendant's actions, however, have erected a formidable obstacle to that pursuit.

As such, the Court finds that plaintiffs are entitled to be reimbursed for all expenditures resulting from defendant's document destruction. Defendant, therefore, shall pay to plaintiffs all attorneys' fees and costs incurred in investigating, researching, preparing, arguing, and presenting all motions touching upon the issue of document destruction. This amount shall include all fees and costs associated with discovery of information concerning document destruction, including, but not exclusively, depositions, interrogatories, and document inspection.

The Court is not persuaded, however, that this amount alone will fully compensate plaintiffs for the harm done to them. Nor will it adequately punish defendant and deter future transgressions. *See National Hockey League,* 427 U.S. at 644, 96 S.Ct. at 2781. The Court, therefore, determines that it is appropriate to multiply plaintiffs' fees and costs by a factor of two. The multiplier is unquestionably justified given defendant's continued attempted deception of opposing counsel and this Court.

Consideration of document reconstruction or any further penalties will be difficult absent a common framework. To that end, within 20 days of this order, plaintiffs shall prepare and submit to the Court and opposing counsel a comprehensive list of documents they believe were destroyed by defendant. This list, which may be further supplemented as information comes to light, shall be utilized by both parties and the Court to delineate those further steps necessary to remedy the injustices arising out of defendant's actions.

Defendant argues that much of the information destroyed can be duplicated. Defendant suggests that a special master should be appointed to identify documents which were destroyed and the content of such documents. The Court presently declines to accept this suggestion, and instead directs counsel for both parties to prepare and submit brief and trenchant memoranda addressing possible resolutions to problems caused by defendant's document destruction. Defendant shall bear all of plaintiffs' attorneys' fees and costs expended in the preparation of these memoranda, document lists, and any hearings before the Court.

Defendant, further, shall forthwith pay to the Clerk of this Court the sum of $1,432.00 for consumption of the Court's time in hearing and considering this motion. This sum shall be deemed to reimburse the United States Courts for two days of otherwise unnecessary expense.

This order is intended to define, but not limit, the universe of penalties ultimately to be imposed. After consideration of the proposals and thoughts of counsel, the Court will render its final document-remedy order.

Accordingly, IT IS ORDERED that:

1. Plaintiffs' motion for sanctions is granted.

2. Upon approval of the Court, defendant shall pay to plaintiffs an amount twice that of all attorneys' fees and costs of investigating, researching, preparing, and arguing all motions touching upon document destruction and sanctions.

3. Plaintiffs shall submit their list of destroyed documents within 20 days of this

order. The parties shall, not later than 30 days from the date of this order, simultaneously propose steps to be taken to identify and possibly replicate those documents which were destroyed.

4. All plaintiffs' costs and fees incurred in complying with this order shall be borne by defendant.

5. Defendant shall pay, forthwith, the sum of $1,432.00 to the Clerk of this Court.