The GATES RUBBER COMPANY, a Colorado corporation, Plaintiff,

v.

BANDO CHEMICAL INDUSTRIES, LIMITED, a Japanese company, Bando American, Inc., an Illinois corporation, Bando Manufacturing of America, Inc., a Kentucky corporation, Bando U.S.A., Inc., a Delaware corporation, Allen Hanano, an individual, Steven R. Piderit, an individual Ron Newman, an individual, Denise Hanano, an individual, and John Does 1–93, Defendants.

Civil A. No. 92–S–0136.

United States District Court, D. Colorado.

May 1, 1996.

Rodger L. Wilson, Wilson and Mayhan, LLC, Denver, CO.

Patrick J. Burke, Denver, CO.

Shelley B. Don, Earl S. Wylder, Don & Hiller, P.C., Denver, CO.

Stephen S. Dunham, Roxanne Jensen, J. Eric Elliff, Morrison & Foerster, Denver, CO.

Robert C. Douglas, Jr., Denver, CO.

Jon Bernhardt, Holme Robert & Owen, LLC, Denver, CO.

Daniel S. Hoffman, McKenna & Cuneo, Denver, CO.

Richard E. Carlton, William M. Dallas, Jr., Richard C. Pepperman, II, Andrew C. Hruska, Sullivan & Cromwell, New York City.

Jeffrey Springer, Denver, CO.

David B. Savitz, Denver, CO.

Gary Lozow, Isaacson, Rosenbau, Woods & Levy, P.C., Denver, CO.

Gene M. Hoffman, Denver, CO.

John M. Richilano, Denver, CO.

## ORDER

SCHLATTER, United States Magistrate Judge.

This order addresses the sanctions which have been sought by Gates Rubber Company (Gates) for what the attorneys for Gates have called chronic and continuous destruction of evidence by the defendants. These sanctions proceedings began almost four years ago on July 22, 1992, with the filing by Gates of its first motion for defendants to show cause as to why sanctions should not be imposed. Subsequently, new claims were added in several amended motions, in all of which Gates has asked that default judgment be entered against the defendants.

With the exception of one part of one claim (section A below), Gates has failed to persuade me that the defendants have engaged in any conduct for which sanctions would be appropriate. Gates' motion for sanctions generally is denied, except that Gates is awarded its attorneys' fees and costs with regard to the one part of the claim on which it prevailed. As to the other claims, the parties are either directed to pay their own fees and costs, or, where Gates' claim is found to have lacked justification, Bando is awarded its fees and costs.

## I. MOTIONS AT ISSUE

The motions at issue, with their respective filing dates, are as follows: Gates' Amended Motion for Sanctions, filed on December 21, 1992; Gates' Supplement to Amended Motion for Sanctions, filed on July 16, 1993; Gates' Second supplement to Amended Motion for Sanctions, filed on September 20, 1993; and, Gates' Motion for Default Sanctions, filed on August 19, 1994.

Ten months after the conclusion of the sanctions hearing itself, Gates filed an additional motion which sought sanctions because the defendants were discovered to have in their possession a marketing study which was done by Gates: Gates' Motion to Consider Additional Evidence Previously Offered in Support of Gates' Motions for Sanctions, filed on August 24, 1995. The corporate defendants responded to this motion in a motion of their own: Motion of Defendants Bando American, Inc., and Bando Manufacturing of America, Inc., for Sanctions Against Gates for Failure to Produce Document Responsive to Multiple Discovery Requests, filed on September 12, 1995. Finally, as recently as April 9, 1996, Bando has filed a motion in which it asks that I impose sanctions upon Gates for failing to notify Bando of the fact of a filing by Gates of a related lawsuit in state court in Arapahoe County.

## II. DEFENDANTS

At this stage of the proceedings, the defendants have been reduced to four main groups: (1) Bando American, Inc., Bando Manufacturing of America, Inc., and Bando USA, Inc. (Bando) These entities are all American corporations, and they are the primary defendants in this case. (2) Bando Chemical Industries, Ltd. (Bando Chemical), is a Japanese company, and it is the parent company of the other Bando entities. The only two individuals who remain in the lawsuit as defendants with potential liability are (3) Steven R. Piderit (Piderit) and (4) Ron Newman (Newman). For ease of reference, when defendants are referred to collectively, they may be referred to simply as "the defendants," or as Bando.

Sanctions are not being sought, or are not available, against some of the defendants. The only parties against whom sanctions may be obtained are Bando (the American entities) and Ron Newman. Claims for sanctions against Steven Piderit and Bando Chemical

were dismissed by me at the conclusion of Gates' case-in-chief at the sanctions hearing.

### III. BACKGROUND FACTS OF THE CASE

Gates and Bando are both involved in the manufacture of industrial belts. Although they compete against one another in the industrial belt market, Gates is clearly the dominant force. Gates enjoys a market share of approximately 38 percent, while Bando's market share is approximately 7 percent.

This case began when Gates accused Bando of stealing trade secret information. The trade secrets which were initially at issue consisted of two computer programs which were contained on computer disks, or floppy disks. Gates called the programs "Design Flex 4.0" and "Life in Hours."

Design Flex is a program which assists Gates' technicians and sales staff to determine the belt size which would be appropriate for a customer's machinery. Ordinarily, engineers are required to do a complicated set of computations involving numerous variables. The engineers at Gates developed Design Flex, which simplifies the process. With this program, sales personnel from Gates could plug in the information which was supplied by the customer, and the computer would make the necessary calculations to arrive at the proper belt size. Gates held a copyright on Design Flex. Life in Hours performs a similar function in the calculation of the number of hours of life which can be expected from a particular industrial belt.

Several of the named individual defendants are former employees of Bando: Allen Hanano, who left Gates to become chief executive officer for Bando American, and Piderit and Newman, engineers who were hired away from Gates by Hanano in 1988. In June of 1989, Gates learned that persons associated with Bando had demonstrated a computer program called "Chauffer" at a trade convention. This program appeared to emulate exactly the functions of Design Flex, and Gates suspected that the former employees had stolen Design Flex, copied it and were now using it in competition with Gates. The former employees had signed written non-competition, fiduciary agreements. Gates therefore filed this present action on January 4, 1992, charging unfair competition, misappropriation of trade secrets, infringement of copyright, and breach of contract. At various hearings, Gates' lawyers have stated that they believe that the value of their claims is "tens of millions," and even "hundreds of millions" of dollars.

Gates sought a temporary restraining order and a permanent injunction. District Judge Daniel B. Sparr denied the request for the TRO, and held a hearing on March 26, 1992, on Gates' request for injunction. Judge Sparr issued an order on June 24, 1992, in which he found that Bando had infringed Gates' copyright and had willfully and maliciously misappropriated trade secrets. *Gates Rubber Co. v. Bando American, Inc.*, 798 F.Supp. 1499 (D.Colo.1992). Bando appealed to the Tenth Circuit, and that Court affirmed Judge Sparr's opinion on the claim of theft of trade secrets, but remanded for Judge Sparr to clarify his findings with regard to the claim of copyright infringement. *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823 (10th Cir.1993). On reconsideration of his order, Judge Sparr vacated his conclusions, and on June 12, 1995, issued an order in which he found that no portions of Design Flex were copyrightable.

During the discovery process for these proceedings, Gates learned that Newman had allegedly destroyed files on his computer, and had modified his computer menu program to delete any reference to Life in Hours, one of Gates' computer programs. Gates filed a motion on September 15, 1992, in which it asked the court to grant to Gates expedited discovery pursuant to the provisions of Fed.R.Civ.P. 34. Gates argued that there was evidence which suggested that Bando was engaged in a process of destroying evidence and erasing computer files, and that irreparable harm would result if Gates was not permitted to enter upon the premises of Bando's various entities for the purpose of copying files and records in order to preserve them from destruction.

Following oral argument on September 25, 1992, I granted the motion of Gates for expedited discovery, and I signed the written order which is now called the "Site Inspection Order." This order permitted the lawyers for Gates to take various technicians to all of Bando's facilities for the purpose of locating and copying materials, including all computer records, which Gates wished to preserve from the alleged destruction. It directed Bando and its employees to destroy no records.

The discovery procedures were supervised by a Special Master who was appointed by Judge Sparr. Under the directions of the Special Master, any identified and copied materials were to be placed in escrow, such as in a vacant room in a warehouse, and were to be released only subject to appropriate motions and orders for discovery. The goal of the Site Inspection Order was to provide a means by which to preserve materials from the alleged destruction, while simultaneously protecting the rights of Bando to object to the production of certain materials under the usual rules of discovery.

Within days of the signing of the Site Inspection Order, Gates began the process of preservation. Teams of lawyers and technicians, from both Gates and Bando, appeared at Bando's various factories and offices. All computer records were copied. Efforts were made to duplicate the hard drives of every computer, and efforts were made to determine for every computer what matters ever had been erased from any Bando computer. Every file cabinet, closet and desk drawer was explored, and, where desired, the contents of files and drawers were removed and taken to a commercial copying establishment. Gates was provided with the unprecedented opportunity to copy at will any materials which the lawyers believed may be relevant to the purposes of their inquiry.

During the site inspections, the lawyers for Gates observed things and events which led them to suspect that Bando had engaged in a deliberate effort to destroy documents and records which were relevant to the claims which Gates had filed against Bando. Gates then began the process of filing motions, amended motions and supplemental motions, all of which argued much the same thing: Bando had destroyed relevant materials; Gates' ability to prosecute its case was impaired; and Bando should be sanctioned by the entry of a default judgment.

Discovery on the merits of the case was put aside, and over the next several years the parties engaged in what has been called "sanctions discovery." All discovery was limited to obtaining testimony, evidence and materials which were relevant to the various claims for sanctions which Gates had alleged. No discovery was started or conducted on the merits of Gates' claims until after the last written argument on sanctions had been provided to me in February of 1995.

On May 23, 1993, in an effort to narrow and clarify the evidence and issues for the sanctions hearing itself, I entered a "Pre-hearing Order." In that order, I eliminated from consideration certain of Gates' complaints surrounding the theft and misuse of their computer programs. I found that many of Gates' complaints were not appropriate matters for sanctions. Instead, they were related to credibility issues which had been addressed, implicitly, by Judge Sparr in the order which he issued at the conclusion of the injunction hearing. Gates had received its "remedy" for any lies or thefts in Judge Sparr's findings that defendants had "willfully and maliciously" stolen trade secrets, and in the injunction which granted Gates the relief it sought. Other issues were related not to sanctions, but to damages, which could be addressed at the conclusion of any trial which may occur in this case. I directed the attorneys for Gates to focus their efforts only on allegations of destruction which they claimed would impair their ability to fully and fairly prepare their case for trial.

The sanctions hearing itself consumed a total of six weeks of evidence and testimony, and the hearing was conducted in several sections over a period of a year. I viewed countless hours of segments of video deposition testimony, covering approximately 20 witnesses; I listened to testimony from 20 witnesses who were called to court to testify live; and I received thousands of pages of pleadings, exhibits, documents and deposition

excerpts. These materials were presented to me in 3-ring binder notebooks, and by the conclusion of the sanctions hearing I had received 50 of them. As of the time of the writing of this order, there are over 1,500 docket entries in the clerk's office, the vast majority of the entries relating to the sanctions proceedings.

## IV. ORGANIZATION OF THIS ORDER

At the conclusion of the evidentiary hearing, Gates had reduced and summarized all of its pending motions for sanctions into one binder entitled "Gates' Sanctions Claims." Bando, in its written closing, organized the claims by letters, A through R, and Gates adopted this organization in its Reply. I will follow this outline of issues, and will track the claims with the same capital letters.

At the end of my findings and conclusions for the claims which were presented at the sanctions hearing itself, I will address the two motions which I have noted above: Gates' Motion to Address Additional Evidence, and Defendants' Motion for Sanctions against Gates. These two motions both address the same document, a document which has most frequently been referred to by the attorneys as "Gates' marketing strategy." Gates is asking for sanctions because Bando was discovered to have the document, and Bando is asking for sanctions because Gates failed to provide the document as a part of Gates' discovery obligations. The two motions can be resolved together under one heading.

Finally, Bando recently filed one additional motion for sanctions. Bando asks me to impose penalties against Gates for the failure of Gates to notify Bando of related litigation which was filed by Gates in state court. Gates has filed a response, and the motion is ripe for determination.

## V. CONCLUSIONS OF LAW

The parties provided me with briefs which presented their respective views of the burdens of proof which should apply in this sanctions proceeding, and of the "elements of the offense" which must be met by Gates in establishing its right to sanctions. The briefs are characterized by sharp disagreements and vigorous debate over the various standards which should be applied by me in these proceedings. I have concluded that the following criteria should be considered in determining the appropriateness and severity of any sanction.

### 1. Elements of the Offense.

■ Gates is seeking sanctions because of what it alleges to be various acts of destruction of evidence by the defendants. Destruction of evidence, or spoliation, is a discovery offense, and in order for Gates to demonstrate that it is entitled to sanctions for defendant's alleged actions it must present evidence which meets or satisfies the elements of the offense. The case law presents various discussions on these elements, but an excellent summary is provided in a volume entitled *Destruction of Evidence:*

Although the elements establishing a basis for imposition of discovery sanctions are not settled, the prevailing consensus of courts is that sanctions are appropriate when a party (1) destroys (2) discoverable matter (3) which the party knew or should have known (4) was relevant to pending, imminent, or reasonably foreseeable litigation.

J. Gorelick et al., *Destruction of Evidence,* § 3.8, p. 88 (Wiley 1989).

■ Determining whether a party has committed actions which satisfy the elements of the offense only begins the inquiry. In conjunction with this determination, judges must explore and weigh other factors. The Tenth Circuit summarized these factors in *Ehrenhaus v. Reynolds,* 965 F.2d 916, 920 (10th Cir.1992):

... [A] court should ordinarily consider a number of factors, including "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; ... (3) the culpability of the litigant," [and] (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance....

965 F.2d 916, 920 (10th Cir.1992) (citations omitted); *See also Jones v. Thompson,* 996 F.2d 261 263 (10th Cir.1993). The *Ehren-*

*haus* case involved the dismissal of a plaintiff's cause of action pursuant to Fed.R.Civ.P. 37(b)(2)(C) because of the plaintiff's failure to appear for his deposition. The Court noted that before dismissal should be ordered, a trial court should consider a fifth factor, the efficacy of lesser sanctions. *Id.* at 920.

Gates and Bando have each attempted in their briefs to reduce the above criteria to a formula, or standardized test. In *Ehrenhaus*, the Tenth Circuit specifically stated that "[t]hese factors do not constitute a rigid test; rather, they represent criteria for the district court to consider prior to imposing dismissal as a sanction." *Id.*

 There are obvious reasons which demonstrate why the criteria for sanctions cannot be reduced to a formula or standardized test. "Determination of the correct sanction for a discovery violation is a fact-specific inquiry," *Id.* at 919, and in making such a determination trial courts are accorded broad discretion. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976). Every single decision in the area of sanctions acknowledges that judicial decisions on discovery violations and sanctions are reviewed under an "abuse of discretion" standard. *See Ehrenhaus* at 919; *Jones v. Thompson*, 996 F.2d 261, 263 (10th Cir.1993); *Gocolay v. New Mexico Federal Savings & Loan*, 968 F.2d 1017, 1020 (10th Cir.1992). "After all, the imposition of sanctions is essentially 'a judgment call.'" *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 394 (1st Cir.1990); *see also, FDIC v. Tekfen Construction and Installation Co.*, 847 F.2d 440, 443 (7th Cir.1988). Thus, judicial decisions which are discretionary cannot be tied down to a fixed rule or formula. If such were the case, courts would lose their flexibility in the sanctions process, and discretion would lose its meaning.

Gates has argued that the five factors which are listed in *Ehrenhaus v. Reynolds* are intended by the Tenth Circuit Court to be applied only in cases which involve sanctions which are dispositive of the case or of particular claims in the case—sanctions such as default judgment or dismissal. It is true that the *Ehrenhaus* case involved an appeal

from a dismissal of a case, and the Tenth Circuit cautioned in that case that the five listed factors should ordinarily be considered "before choosing dismissal as a just sanction." At p. 920. However, there is nothing in the case which suggests that the Court intended to restrict trial courts to a consideration of these factors in *only* those cases which involve dispositive sanctions. The whole point of these five factors as "criteria" is to provide trial courts with some guidance as they make decisions with regard to whether dispositive sanctions are appropriate, or are *not* appropriate. Simply because dismissal or default judgment may not be at issue in a case does not mean that the criteria are no longer applicable or helpful.

Two of the factors which are discussed in *Ehrenhaus v. Reynolds* have taken on greater importance in most of the cases on sanctions for spoliation: (1) the culpability of the offender, or the alleged mental state which gave rise to the destruction of evidence, and (2) the degree of prejudice or harm which resulted from the actions of the offender. A review of the cases reflects that the two factors of "mental state" and "harm" are intertwined, and one of them can hardly be discussed without a simultaneous examination of the other.

### 2. Mental State.

 The first factor of significant importance is that of the mental state of the alleged offender. Where a particular destruction of evidence is found to have been prompted by a malicious intent, and has caused a high degree of prejudice, severe sanctions are easily supportable. *Computer Associates Int'l v. American Fundware, Inc.*, 133 F.R.D. 166, 169 (D.Colo.1990). Where the circumstances are mixed, however, the course of action for a trial judge is not as easily determined. As one Court noted, "[n]ondisclosure comes in different shapes and sizes: it may be accidental or inadvertent, or considerably more blameworthy," as where the nonproduction was "knowing and purposeful." *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir.1988). In some cases, a judge may find that an offender was motivated by malicious intent, but there was in-

sufficient prejudice to warrant dismissal or default. *Capellupo v. FMC Corporation,* 126 F.R.D. 545, 552 (D.Minn.1989). Or there may be circumstances where a party was merely negligent in the preservation of evidence, but the carelessness caused a high degree of prejudice in the case, and default judgment was warranted. *Jones v. Goodyear,* 966 F.2d 220, 224 (7th Cir.1992). The factors of "mental state" and "harm" slide past each other in the wide variety of circumstances which are presented by different cases. "The concept of misconduct seems mutable: not every instance of nondisclosure merits the same judicial response." *Anderson* at 923. Any effort to find a rule or formula to be applied to all cases would be frustrating at best.

■ The cases generally are unanimous in declaring that a dispositive sanction may be imposed only when the failure to comply with discovery demands is the result of wilfullness, bad faith, or some fault of a party other than inability to comply. *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 208–10, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255 (1958). *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. at 640, 96 S.Ct. at 2779; *FDIC v. Daily,* 973 F.2d 1525, 1529 (10th Cir.1992); *Gocolay v. New Mexico Federal Savings & Loan Assoc.,* 968 F.2d 1017, 1020. A "willful failure" is defined as " 'any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown.' " *In re Standard Metals,* 817 F.2d 625, 628–29 (10th Cir.1987) (quoting *Patterson v. C.I.T. Corp.,* 352 F.2d 333, 336 (10th Cir.1965)).

■ Where no willfulness, bad faith or fault is shown from the evidence, a dispositive sanction would be improper. *Gocolay,* 968 F.2d at 1020. On the other hand, where willfulness or bad faith *is* shown by the evidence, the trial court is not *required* to order dispositive sanctions. *Alexander v. National Farmers Organization,* 687 F.2d 1173, 1205 (8th Cir.1982); *Capellupo v. FMC Corp.,* 126 F.R.D. 545, 551 ("outrageous" and "premeditated effort to subvert the proceedings," monetary sanctions imposed); *EEOC v. Jacksonville Shipyards,* 690 F.Supp. 995, 997

(M.D.Fla.1988) (willful destruction of records, summary judgment denied). The authority of a court to sanction a party through default judgment or dismissal is permissive, rather than mandatory, and "[a] district court's discretion to fashion discovery orders and remedies for misconduct is broad." *Jackson v. Harvard University,* 900 F.2d 464, 468 (1st Cir.1990).

■ On the other hand, serious sanctions are warranted in cases where the judge finds willfulness or bad faith. This is so because actions which are found to be deliberate and purposeful ought to be punished accordingly. *Anderson v. Cryovac* 862 F.2d 910, 925 (1st Cir.1988). Where materials, documents or records are destroyed with conscious and deliberate intent, a judge can presume that the suppressed evidence would have damaged the nondisclosing party's case. *Id.; Computer Associates Int'l v. American Fundware, Inc.,* 133 F.R.D. 166, 169 (D.Colo. 1990); *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217–19 (1st Cir.1982).

■ Where a judge finds no willfulness, bad faith or fault, there exists beneath these states of mind a broad panoply of unintentional conduct: recklessness, gross negligence, negligence, carelessness, inadvertence or accident. The discretion to impose sanctions for reckless or negligent misconduct is as broad as the discretion which is accorded for imposition of sanctions where the misconduct was deliberate and intentional. Review is limited to determining "whether the trial court's chosen course of action came 'safely within the universe of suitable' alternatives." *Jackson v. Harvard University,* 900 F.2d at 468 (quoting *Fashion House, Inc. v. K mart Corp.,* 892 F.2d 1076, 1082 (1st Cir.1989)).

■ In the usual case, a party's loss of evidence through carelessness might not result in the imposition of a dispositive sanction. Where misconduct is not willful or intentional, there is less reason to presume that the loss of evidence flowed from a consciousness that the materials would hurt a party's case. *Anderson v. Cryovac,* 862 F.2d at 926; *Jackson* 900 F.2d at 469. Even so, in some circumstances, it would not be improp-

er for a court to order dispositive sanctions for negligent conduct. *Jones v. Goodyear Tire and Rubber Co.*, 966 F.2d 220, 224 (7th Cir.1992). In order to determine the appropriateness of certain sanctions, whether dispositive or otherwise, judges need to balance the degree of misconduct evidenced by a party's mental state against the degree of harm which flows from the misconduct.

### 3. Prejudice.

■ The second factor of significant importance is that of the degree of prejudice which has been caused by the conduct of the alleged offender. Prejudice from the destruction of evidence can range from serious to modest. In some cases, there may be no harm at all as a result of an opponent's loss or destruction of evidence. In weighing and determining the appropriateness and severity of sanctions, judges should examine the materiality and value of the suppressed evidence upon the ability of a victim to fully and fairly prepare for trial. *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 504 (4th Cir.1977); *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1456 (C.D.Calif.1984). On the one hand, where the destruction of evidence results in substantial impairment to a party's abilities to prepare for trial, serious sanctions might be warranted. *Anderson v. Cryovac*, 862 F.2d at 924. On the other hand, "concealed evidence may turn out to be cumulative, insignificant, or of marginal relevance." *Id.* In such circumstances, dispositive sanctions would undoubtedly constitute an overreaction, but sanctions of less severity would perhaps be appropriate.

■ The burden is on the aggrieved party to establish " 'a reasonable possibility, based on concrete evidence rather than a fertile imagination' that access to the [lost material] would have produced evidence favorable to his cause." *Bright v. Ford Motor Co.*, 63 Ohio App.3d 256, 578 N.E.2d 547, 549 (1990) (quoting *Nally v. Volkswagen of America, Inc.*, 405 Mass. 191, 539 N.E.2d 1017 (1989)). Professor Wigmore explains the burden upon the aggrieved party in this fashion:

Thus, when B denies the identity of the document spoliated or the identity of the document failed to be produced, no inference can be drawn until the jury find the fact against B's denial; and obviously this cannot be done until some evidence of this identity has been introduced by A. It is this consideration of caution, this logical requirement, which seems to account partly for the rule as laid down by some courts that some evidence of the contents of the document must be introduced as a preliminary to the use of the inference.

Keeping in mind, then, the object of the requirement, the rule might correctly be stated as follows: The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor, *provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one* as to whose contents it is desired to draw an inference. In applying this rule, care should be taken not to require anything like specific details of contents, but merely such evidence as goes to general marks of identity.

2 *Wigmore on Evidence* § 291, p. 228 (Little Brown & Co.) (emphasis in original).

■ The imposition of dispositive sanctions "should be confined to the 'flagrant case' in which it is demonstrated that the failure to produce 'materially affect(s) the substantial rights of the adverse party' and is 'prejudicial to the presentation of his case.' " *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 503 (4th Cir.1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978). The proper sanction must be " 'no more severe * * * than is necessary to prevent prejudice to the movant.' " *Id.* The trial judge must consider how the absence of any particular evidence which was not produced would impair a party's ability to establish its case. *Id.; General Atomic v. Exxon*, 90 F.R.D. 290, 308 (S.D.Calif.1981) (no dismissal where other evidence available).

■ Gates has pointed out on numerous occasions that the dilemma of lost evidence is

that the aggrieved party can never know what it was, and can therefore never know the value that it may have had to the aggrieved party's case. To a certain extent, this is a compelling argument. However, before any sanctions would be appropriate, a judge must at least be satisfied that the lost materials had, or would have had, *some* relevance and materiality to the proceedings. "[S]ome extrinsic evidence of the content of the evidence is necessary for the trier of fact to be able to determine in what respect and to what extent it would have been detrimental." *Hudson Transit Lines, Inc. v. Zozichowski*, 142 F.R.D. 68, 76 (S.D.N.Y.1991). This is hardly an impossible task, or, in some circumstances, it is hardly a difficult task. For example, in *Telectron v. Overhead Door Corp.*, 116 F.R.D. 107 (S.D.Fla.1987), default judgment was entered against the defendant for destroying certain documents and records. The exact contents of the documents were unknown, but it *was* known that the documents fell within a category of documents which were relevant to the plaintiff's claims, i.e., sales-related records. *Id.* at 109.

Similarly, in *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443 (C.D.Calif.1984), default judgment again was entered where documents were destroyed. The contents of the documents were unknown, but it was known that the nature and class of documents destroyed were purchase, sale and inventory records, all of which were relevant to the plaintiff's abilities to prove its case. *Id.* at 1445. In *Norman v. Young*, 422 F.2d 470, 473 (10th Cir.1970), the defendant could produce *no* financial records of the type which would ordinarily be kept by a business of its nature, and default judgment was granted. On the other hand, default judgment was rejected in *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17 (1st Cir.1981). There was no evidence that the destroyed records would have shown that the aggrieved party was prejudiced. "At best, they were an efficient starting point from which appellant could have ventured to discover" information which would tend to prove his injuries in the case.

In *Marrocco v. General Motors Corp.*, 966 F.2d 220 (7th Cir.1992), when certain evidence was lost the Court dismissed plaintiff's cause of action, and observed, "[b]ut therein lies the prejudice—GM was denied any opportunity to find out one way or the other" if the lost evidence would have assisted GM in its case. *Id.* at 223. However, the lost evidence in the case was known to be a grouping of ball bearings which had been negligently scrambled by the plaintiff, and their particular order was crucial to the outcome of the case. Like Humpty Dumpty, they simply could not be put back together again, and were irretrievably lost as evidence.

▮ Gates is correct when it argues that destruction of evidence may give rise to a presumption of prejudice. However, any such presumption is rebuttable, *Bright v. Ford Motor Co.*, 578 N.E.2d at 550, and the presumption must be one which is warranted, or which naturally flows from the nature of the material or documents which have been destroyed. "Before an adverse inference may be drawn, there must be some showing that there is in fact a nexus between the proposed inference and the information contained in the lost evidence." *Turner v. Hudson Transit Lines*, 142 F.R.D. 68, 76 (S.D.N.Y.1991). A negative inference can be drawn only if there is substantial circumstantial evidence which supports the facts to be inferred. *Nation–Wide Check Corp.*, 692 F.2d 214, 218–19 (1st Cir.1982). "[S]ome extrinsic evidence of the content of the evidence is necessary for the trier of fact to be able to determine in what respect and to what extent it would have been detrimental." *Turner*, at 76. Although judges must be alert to the potential for harm when evidence is destroyed, judges must be wary when parties seek to prove too much from the absence of evidence. *INA Aviation Corp. v. United States*, 468 F.Supp. 695, 700 (E.D.N.Y.1979).

▮ Sanctions have a number of purposes. Two important purposes to be served in a case where allegations of destruction of evidence are asserted are punishment and deterrence. Sanctions serve "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the

absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. at 643, 96 S.Ct. at 2781; *Computer Associates Int'l, Inc. v. American Fundware, Inc.*, 133 F.R.D. at 169. Other functions include compensation of the victims of evidence destruction and the promotion of accuracy of the fact-finding process. J. Gorelick et al., *Destruction of Evidence*, § 3.15, p. 113 (Wiley 1989). Finally, judges have recognized the role which sanctions play in the management of cases on a crowded docket. *Ohio v. Crofters, Inc.*, 75 F.R.D. 12, 22 (D.Colo.1977) (Sherman G. Finesilver, J.).

## VI. CHOICE OF SANCTIONS

■ The choice of a sanction to impose in a particular case is a matter which is within the discretion of the court. *Ehrenhaus*, 965 F.2d at 919. To fulfill the purposes of discovery sanctions, however, "courts select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Destruction of Evidence*, § 3.16, p. 117. Gates has continuously argued that the alleged destruction of evidence which has been conducted by the defendants in this case warrants the imposition of the most severe of sanctions, that of default judgment.

■ There are no cases in this area which fail to observe that dismissals and default judgments are "extreme sanction[s] appropriate only in cases of willful misconduct," *Id.*, and should be confined to "flagrant cases" where failure to produce evidence "materially affect[s] the substantial rights of the adverse party" and is "prejudicial to the presentation of his case." *Wilson v. Volkswagen of America*, 561 F.2d at 504; *Gocolay*, 968 F.2d at 1020. Default judgment is " 'the most severe in the spectrum of sanctions provided by statute or rule ...,' [and] the Trial Court's 'range of discretion is more narrow' than when the Court is imposing other less severe sanctions." *Wilson* at 503.

Any consideration of default judgment raises concerns of a constitutional dimension:

The reason for this narrower range of discretion is that the sanction of a default judgment, though "a rational method of

enforcement of the discovery rules," in an appropriate case, represents in effect "an infringement upon a party's right to trial by jury under the seventh amendment" and runs counter to "sound public policy of deciding cases on their merits," and against depriving a party of his "fair day in court."

*Id.*

■ The Tenth Circuit has stated, " 'We do not favor default judgments because the court's power is used to enter and enforce judgments regardless of the merits of the case ....' " *Ruplinger v. Rains*, 946 F.2d 731, 732 (10th Cir.1991) (quoting *Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444 (10th Cir.1983)).

"[S]trong policies favor resolution of disputes on their merits: '[T]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.' "

*Rains* at 732. These policies must be considered with particular care in cases where parties such as Gates are seeking damages which measure in the hundreds of millions of dollars. In such circumstances, the denial of any trial at all would carry with it consequences of extreme gravity.

■ Sanctions which preclude the admission of certain evidence or provide for a negative inference in the place of destroyed evidence operate in the same fashion as a default judgment. They intrude into the "truth-finding process" of a trial, and represent "grave steps" for a trial judge to take. *Jackson v. Harvard University*, 900 F.2d at 469. Such sanctions should be considered only with very great restraint.

■ On the one hand, judges must be careful to tailor the remedy to the problem, and "take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms." *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir. 1990). The sanction to be applied needs to be one which is " 'appropriate to the truth-finding process, not one that ... serve[s] only further to suppress evidence.' " *Jack-*

*son* at 469. On the other hand, the courts must guard parties' rights to fair trial; *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 485 (S.D.Fla.1984) (intentional destruction of documents "eliminated the plaintiffs' right to have their case decided on the merits"); *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1451 (C.D.Calif.1984) (defendant's destruction of relevant records "impaired Thompson's ability to obtain a full and fair trial by jury on all issues raised by Thompson.") The discretion to be exercised by the courts is one which must balance the rights and obligations of the parties against one another, and against the needs for a fair trial.

## VII. RULE 37 AND INHERENT POWERS

Both Gates and Bando have commented on the fact that the circumstances of this case may be subject to evaluation under either Fed.R.Civ.P. 37(b)(2), or under the court's inherent powers to impose sanctions. Gates alleges that certain of Bando's alleged acts of destruction may be sanctionable pursuant to Rule 37 because the actions would be a violation of this court's Site Inspection Order of September 25, 1992. To the extent that the actions are not covered by this order, Gates asks the court to utilize its inherent powers in considering whether to impose sanctions.

In their respective arguments, the parties see different conclusions resulting from the application of Rule 37 or the inherent powers of the court. Bando, on the one hand, implies that utilization of the inherent powers of the court for the purpose of sanctions carries with it a higher burden of proof than would sanctions which might be imposed pursuant to Rule 37. (Deft's Br., August 2, 1993, p. 4.) Gates, on the other hand, asserts that under Rule 37 the mental state of the alleged offender is irrelevant. (Pltf' Br., July 30, 1993, p. 6.) I do not agree with either of these propositions.

■ I have found that, in the context of this Order, any distinctions between Rule 37 and the inherent powers of the court are distinctions without differences. The Supreme Court, discussing the role of the inherent powers of the court *vis a vis* Rule 11,

has noted that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49, 111 S.Ct. 2123, 2135, 115 L.Ed.2d 27 (1991). A federal court is not "forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Id.* at 50–51, 111 S.Ct. at 2135–36.

■ In *Telectron v. Overhead Door Corp.*, a case which involved the destruction of sales pricing documents, the trial judge noted that the inherent powers of the court were "broader and more flexible than the authority to sanction found in the Federal Rules of Civil Procedure," but the judge concluded that the analysis under Rule 37 was "essentially the same, and our conclusion is the same." 116 F.R.D. at 126–28. In *EEOC v. Jacksonville Shipyards, Inc.*, a case where the judge was concerned with an appropriate sanction for the destruction of certain personnel records, the act of destruction preceded the entry of any order to preserve records. 690 F.Supp. 995, 997. The judge wrote, "[c]onduct of the kind which ordinarily would be sanctionable under Rule 37, but falls outside the express terms of the rule, can be sanctioned by proper exercise of this court's inherent powers." *Id.* The judge concluded that it was proper to look to rule 37 "as a guide" to determine the proper level of response to defendant's offense. *Id.; see also Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. at 1455. District Judge Jim R. Carrigan of this district concluded that "inherent power has been reinforced by Fed.R.Civ.P. 37(b)(2)." *Computer Associates*, 133 F.R.D. at 168. Rule 37 and the inherent powers of the court may be different routes by which to reach a result, but the analysis of the criteria along the way can be exactly the same.

*Anderson v. Cryovac*, to which reference has been made in this order, involved an analysis of the proper sanction to impose in circumstances where the aggrieved party was seeking relief from judgment under Fed. R.Civ.P. 60(b)(3). Gates relied heavily upon this case in its initial brief of July 30, 1996. After seeing the manner in which Bando was

able to use the case, Gates apparently decided in its response brief of August 26, 1993, that *Anderson* should be distinguished, because it involved Rule 60, and not rule 37 or the inherent powers of the court. 862 F.2d 910. Again, in the circumstances of this case, I find any distinction to be a distinction without a difference. After all, the entire area of sanctions is an area of broad discretion. Thus, it would be improper to conclude that there is any one case or holding, for example, which would represent a precedent which would compel a particular holding in *Gates v. Bando.* The discussion by the First Circuit in *Anderson* is useful in any analysis of the concept of sanctions.

I do not consider it important that some of the claims in these sanctions proceedings may be covered by Rule 37, while others may be covered by the inherent powers of the court. All of the claims involve allegations of concealment or destruction of evidence. I conclude that the analysis of the claims would be the same, whether pursuant to Rule 37 or pursuant to the inherent powers of the court.

## VIII. BURDENS OF PROOF

I found no opinion or decision in the Tenth Circuit which provided a discussion of the burdens of proof which should apply in cases where sanctions are sought. In the First Circuit, the Court in *Anderson* found that in circumstances which would warrant extreme sanctions the movant must prove the opponent's misconduct the same as one would prove "fraud or misrepresentation—by clear and convincing evidence." *Id.* at 923. The party must then demonstrate prejudice, either through direct evidence which is clear and convincing, or by means of a presumption, if warranted by the evidence. *Id.* If the party lacks direct evidence that the destroyed material would have been helpful in the prosecution of its case, and relies instead upon a presumption that it would have been helpful, the opposing party may rebut the presumption with "clear and convincing evidence demonstrating that the withheld material was in fact inconsequential." *Id.* at 925. The *Anderson* Court recognized that serious sanctions may be appropriate even where the offending party lacked malicious intent if it can be shown that acts of loss or destruction, whether through accident or carelessness, resulted in substantial prejudice. At p. 926.

Other courts have held that dispositive sanctions may be ordered where discovery violations are demonstrated by a preponderance of the evidence. *General Atomic Co. v. Exxon Nuclear Co.,* 90 F.R.D. 290, 296 (S.D.Cal.1981) (default judgment denied because plaintiff "has some evidence available to utilize in the presentation of its claims," at p. 308). In *Carlucci v. Piper Aircraft Corp.,* the trial judge did not articulate a burden of proof, but found that "plaintiffs have presented convincing and consistent" evidence to support a finding of intentional destruction of documents, and to support the request for default judgment. 102 F.R.D. 472, 485 (S.D.Fla.1984).

I conclude that the burden of proof for sanctions should be as stringent as the circumstances require. If a judge intends to order a dismissal or default judgment because of discovery violations, the judge should do so only if the judge is impressed to do so by evidence which is clear and convincing. To do otherwise would be to contravene the strong public policy which favors adjudication of cases on their merits. *Ruplinger v. Rains,* 946 F.2d at 732; *Wilson v. Volkswagen of America,* 561 F.2d at 503; *General Atomic Co. v. Exxon Nuclear Co.,* 90 F.R.D. at 307. The burden of proof under which a trial is governed is "preponderance of the evidence." To remove from a party the right to have a trial in the first place should require much more than a mere preponderance. Dismissal, default judgment and even presumptions and orders of preclusion are sanctions which deny a party's full rights to a trial on the merits. The elimination of valued rights should not occur in the absence of a degree of proof which reflects the very serious nature of the decision.

If a judge is not persuaded to enter dismissal or default judgment by virtue of clear and convincing evidence, the judge may still impose lesser sanctions if a need is shown by a preponderance of the evidence. Where lesser sanctions are imposed, the rights of the parties to a trial on the merits

are not completely defeated. Lesser sanctions serve a different purpose than dispositive sanctions. *Ohio v. Crofters, Inc.*, 75 F.R.D. 12, 14 (case management).

The burden-shifting formula created by the First Circuit in *Anderson v. Cryovac*, although perhaps helpful to some, can be confusing in its application. I conclude that dispositive sanctions should only be granted where the moving party persuades the judge to do so by evidence which is clear and convincing, and I conclude that lesser sanctions may be imposed where the judge is persuaded by a preponderance of the evidence. However, in either case, the burden of proof remains with the moving party.

 When the party has alleged the destruction of evidence, as Gates has alleged in this case, the party may be assisted by a presumption or inference that the destruction of the material was prejudicial to its case. As with any judicial proceeding, evidence which tends to prove misconduct or prejudice, whether the evidence is direct or presumed, may be rebutted by the alleged offender. Ultimately, the final resolution of any sanctions proceeding turns on whether the judge is persuaded to impose sanctions, and, if so, whether the degree of persuasion of the judge is by clear and convincing evidence, or by a preponderance of the evidence. Regardless of the degree of persuasion, where sanctions are deemed appropriate the judge holds the discretion to impose any sanction which does not result in a disposition of the case. A judge's discretion is limited only if a dispositive sanction is considered. Default judgment or dismissal are limited to circumstances where such a sanction is warranted by evidence which is clear and convincing.

All of the factors for imposition of sanctions must be considered together, as a whole. The court must balance the degree of misconduct with the severity of prejudice. If, after balancing all factors, the court is persuaded by clear and convincing evidence that the offending party acted deliberately and in bad faith, or, in the absence of bad faith the court is persuaded by clear and convincing evidence that prejudice to the moving party warrants a severe sanction, then either dismissal or default judgment may be entered.

## IX. FINDINGS OF FACT

### 1. Introduction.

The purpose of the sanctions hearing was to determine whether or not any of the defendants had violated any discovery obligations, and, if so, to determine what sanctions would be appropriate for each violation. The lawyers for Gates argued continuously that the conduct of people associated with Bando was sufficiently serious that the most extreme sanction of default judgment was warranted. I do not agree.

Two former employees of Gates, Newman and Piderit, have been found by Judge Sparr to have stolen certain of Gates' computer programs, and to have utilized them in their activities at Bando. The facts which underlie this finding by Judge Sparr were not disputed by Bando during the sanctions proceedings. The lawyers for Gates attempted to persuade me that the actions of Newman and Piderit were a reflection of a grand conspiracy among all of the employees of the Bando corporations to conceal or destroy evidence. I am not persuaded.

The lawyers for Gates deposed numerous individuals associated with Bando. The lawyers have argued that every one of these individuals is a liar. With the possible exceptions of Newman and Piderit, I did not find this to be the case. For the most part, I found the employees of Bando to be ordinary people who were thrust into an extremely difficult set of circumstances by my Site Inspection Order, and did the best that they could toward interpreting and understanding the requirements of that order. Neither Newman nor Piderit testified at the sanctions hearing.

 Viewing the evidence as a whole, there is overwhelming evidence to support Bando's point that Gates received full and complete cooperation from Bando employees during the site inspection. One of Gates' lawyers, Stephen Craig, noted in an affidavit that literally "millions of pages of documents" were produced for review, inspection

and copying. The lawyers for Gates argue that I should ignore this massive production of material, some of it revealing the very core of Bando's manufacturing processes, and focus instead on the relatively few pages which Gates claims have been concealed or destroyed. In the circumstances of this case, that argument represents a reversal of priorities.

The lawyers for Gates have delayed this case for the better part of three and one-half years over an exaggerated concern with minutiae. They had little idea what they were looking for during the site inspection. They copied very little of the type of materials which they now complain were destroyed by the defendants. They admit that they have not examined any of the large quantity of boxes of documents which they did copy and preserve. In fact, the lawyers for Gates have argued vociferously that they have not yet even *started* discovery on the merits of this controversy. Harm from the alleged destruction of documents must be measured in light of what *is* produced, as well as what is *not* produced. *Capellupo v. FMC Corp.,* 126 F.R.D. at 553. Gates has no idea what has been produced.

## 2. Awards of Legal Fees.

Fed.R.Civ.P. 37(a)(4)(A) and (B) provides that sanctions in the form of fees and costs shall be imposed against any party who lacks "substantial justification" for prosecuting or opposing a discovery motion which is at issue before the court. With regard to each of the claims which was alleged and prosecuted, I have examined the evidence in order to determine whether the prosecution or opposition of the claim was without substantial justification. As I noted in Part VII above, my analysis of the claims is identical whether the claim is asserted pursuant to Rule 37 or pursuant to the inherent powers of the court. I have therefore applied the mandates of Rule 37(a)(4)(A) and (B) to all claims.

I have found no claim in which Bando was not substantially justified in its opposition. Gates pursued default judgment with regard to each claim, whether considered singly or in conjunction with other claims. Having examined each and every claim, both individually and as a totality, and having found that Gates has not met its burden with regard to default judgment, Bando is the prevailing party on all claims.

With the exception of one part of one claim, Part A below, Gates has not met its burden of persuasion with regard to any type of sanction. Bando is the prevailing party on every other claim. At the conclusion of each claim I enter a finding with regard to whether or not Gates was substantially justified in the initiation or prosecution of the claim. As to those claims, each side shall pay its own fees and costs. As to the others, Bando will be awarded its fees and costs.

## 3. Gates' Claims.

### A. Newman Deletion of Computer Materials.

Gates alleges in this claim that Ron Newman stole a computer program called Life in Hours when he left his employment with Gates. For purposes of sanctions, Gates alleges in this claim that Newman did two things: (1) removed evidence of Life in Hours from his computer at the Denver facility of Bando American, Inc. (the Denver computer), and (2) attempted to delete word processing files which contained evidence that he had used this program in his activities at Bando. These two claims must be addressed separately, because each separate action by Newman has a different effect.

(1) *Deletion of Life in Hours.* Newman learned on February 6, 1992, that he had been named as a defendant by Gates. In his deposition testimony, Newman admitted that this program was installed in the computer which he used at the Denver Bando facility. He testified that upon learning of the allegations in the Amended Complaint he took immediate efforts to remove it. He copied the Life in Hours to a floppy disk, and then deleted the files from his hard drive. Finally, he deleted reference to the program from his entry menu. The following day, Newman gave the disk to the attorney who was retained by Bando. Gates argues that Newman, at the time he copied Life in Hours to a disk, never intended to give the it to an

attorney. Nevertheless, he did. A copy of the disk was provided to Gates in discovery.

Gates argues that Newman's deposition testimony establishes that he has admitted that he "destroyed" evidence. Bando argues that Newman acted reasonably, and that by downloading to a disk he preserved, rather than destroyed, evidence. I agree with Bando.

Bando's expert on matters associated with computer science was Robert Wedig, who holds a Ph.D. in computer science from Stanford. Wedig's credentials, experience and knowledge were impressive, and I relied upon his opinions. Gates failed to obtain a similar expert in timely fashion. Gates did offer the testimony of Robert Voorhees, the technician who was hired by Gates to copy the hard drive of the computer at Bando's Denver facility. His credentials, experience and knowledge were nowhere near those of Dr. Wedig, and I placed much less weight on his testimony than on Wedig's.

Wedig confirmed what is generally known by all computer users, that the process of copying from hard drive to floppy disk does not result in the loss or deletion of data, and "no information is lost." Gates argues as follows: this is true only if Newman downloads everything; Newman is a liar; therefore, Wedig's conclusions are faulty.

There is no evidence that Newman "lied" about everything, and even Gates relies upon his testimony when it suits Gates' purposes to do so. Whether Newman is a "liar" or not, when a party preserves material, as Newman did here, and provides that material to an opponent as part of a discovery obligation, as Bando did here, I find that it would be unreasonable to infer that material was destroyed unless there is some evidence which leads to such an inference. I am persuaded that Newman preserved, rather than destroyed, evidence when he copied from hard drive to disk.

This order would be unduly complicated if I discussed each detail of the technical disputes which surrounded the downloading of Life in Hours to disk, and each detail of the various files which were lost or recaptured from Newman's word processing files.

However, one particular dispute should receive attention. During the injunction proceedings which were conducted before Judge Sparr, counsel for Bando introduced into evidence a disk and printout of a directory which purported to be a copy of the disk and directory which had been downloaded by Newman. The directory of the disk provided to Gates contained 45 file entries, while the directory provided to the court contained only 44 file entries. The missing file is LHX. SEC.DAT. Counsel for Bando at that time, James Lowe, stated to the court that he did not know how this could have happened. Gates argued that this was an intentional effort to mislead the court, for which Bando should be sanctioned.

I am satisfied with the explanation which was offered by Wedig, though the explanation was extremely technical. In fact, according to Wedig, the missing file was present in deleted form on the disk provided to the court. Wedig offered a detailed explanation on the mechanics of how this one file would be deleted inadvertently when another portion of the program was run by someone. In addition to the Wedig explanation, I fail to see how Bando would be benefitted, or Gates harmed, by the fact that the court copy reflected one less file, while the copy received by Gates contained all of the files. Gates received full discovery, and if any harm resulted from the confusion surrounding the disk which was introduced into evidence, Judge Sparr implicitly resolved the problem in his injunction ruling of June 24, 1992, which was in favor of Gates.

(2) *Destruction of Word Processing Files.* Newman admitted during his deposition testimony that at about the same time that he downloaded Life in Hours to a disk he "cleaned up" his word processing files by deleting certain materials which he had previously stored on his computer. He stated that he did not erase any materials which were relevant to this litigation. The lawyers for defendants argue that Gates is not harmed by Newman's acts because all files were recaptured in some manner: some files were preserved on disk; some were provided to Gates as "hard copy" (i.e., the printed letters or memos which were deleted from

the hard drive); and others were shown to have been deleted in the ordinary course of business prior to the initiation of the litigation by Gates.

■ Gates argues, correctly, that the court cannot rely upon the opinions of Newman as to whether the materials which he deleted are relevant or not to this case. Gates argues further that Bando cannot demonstrate that Newman's files were deleted prior to litigation, or were recaptured. On this subject, Bando presented the testimony of Wedig. Gates attacked the testimony similarly to above: the opinions of Wedig are only as accurate as the truthfulness of Newman.

The accuracy of Wedig's testimony does not depend exclusively upon the truthfulness of Newman. During the sanctions hearing, I was presented with testimony which related to what might be dubbed the "inside" of the Denver computer. The two experts, Voorhees and Wedig, agreed that deleted files remain on the hard drive, and only disappear in pieces, in a random fashion, as other data is written over the files. In view of this fact, in an order of February 10, 1992, Judge Sparr granted to Gates the opportunity to copy the hard drive in the Denver computer in order to obtain as much information as was available with regard to deleted files. Gates retained Voorhees as its technician to do the copying, and he attempted to do this through the use of a program called Norton's Unerase. Proper use of the program could yield information, or partial pictures, about files which were once present on the computer's hard drive, but were deleted.

■ Gates argued that Voorhees did an adequate job of copying the Denver computer. Wedig persuaded me, however, that Voorhees lost, or failed to capture, important information because of an inadequate effort. In using Norton's Unerase, Voorhees unnecessarily copied this program onto the Denver computer first, and thereby overwrote 7 to 8 percent of the hard drive before commencing his efforts to copy the contents.

Wedig noted that information which is introduced into a computer is distributed, in a random manner, to space which is not being used, or to space which contains a deleted file and is therefore available for use. To use Norton's Unerase, it was unnecessary for Voorhees to copy it onto the hard drive of the Denver computer. By doing so, however, the program obliterated, at random, 7 to 8 percent of the information which would otherwise have been available. No one can ever know what items were overwritten by the Unerase program.

Additionally, Voorhees did not obtain the creation dates of certain of the files which overwrote deleted files. This information would have assisted in determining the deletion date of some files. If a deleted file has been overwritten by a file which was created *prior* to the Gates litigation, for example, Bando would be relieved of suspicion as to that file. Thus, failure to obtain the creation dates of files represented a failure to preserve evidence which would have been important to Bando in its efforts to resist Gates' motions for default judgment.

Wedig pointed out that Voorhees should have done an "image backup" of the hard drive, which would have collected every piece of information on the hard drive, whether the information was allocated as a file or not. Instead, Voorhees did a "file by file" backup, which copies only existing, nondeleted files on the hard drive. The technology for an image backup was available at the time of these events, though rarely used by anyone. Wedig testified that Gates was collecting evidence for judicial purposes; therefore, Gates had a duty to utilize the method which would yield the most complete and accurate results. I agree with Wedig. In these circumstances, Gates failed to preserve evidence in the most appropriate manner. Gates' failure to obtain an image backup of the computer is a factor which I have weighed against Gates as I considered a number of the claims which Gates has asserted.

Gates argues that Bando had an equal opportunity to preserve evidence, and if Bando thought that an image backup was so important, it could have obtained such a result itself. I do not find this argument persuasive. Bando probably had very little idea that the copying of its Denver computer would spark a sanctions proceeding which

would take several years, and cost several millions of dollars. Gates, on the other hand, has been the party which has been driving the controversy, and has sought to use the "absence" of evidence to its fullest advantage. Therefore, I find that the duty was on Gates, and not Bando, to utilize the best technology available.

Gates also argues that a loss of 7 to 8 percent of the information available is insignificant. I disagree. If the roles had been reversed, and if Bando had been responsible for copying the hard drive in such a way that 7 to 8 percent of the information was lost, I have no doubt that the lawyers for Gates would find that the 7 to 8 percent loss was of critical, even fatal, importance. In fact, that is exactly the argument which Gates is making throughout these sanctions proceedings: some small portion of alleged evidence has been lost; no one knows what it is; therefore, Gates should be granted a default judgment. I have weighed Gates' concern with the loss of data against its failure to preserve the evidence in the most complete manner available, and against the totality of discovery material which has been made available to Gates.

 Some things remain clear. Newman did, in fact, delete word processing files. The deletion of the files was intentional, and was done after he had learned that he was named in the litigation. I find, however, that an accounting has been made of all of the deleted files, either by a showing that they were deleted prior to the initiation of this litigation, by a showing that they were recaptured, or by a showing that adequate substitutes in the form of hard copies have been provided.

Nevertheless, evidence of the destruction of word processing files has caused Gates to incur attorneys fees and costs which it would not otherwise have incurred. Gates was justified in its challenge to the adequacy of the computer record which was being provided by Bando, and the challenge necessarily resulted in the legal fees and costs which are associated with the filing of the motion for sanctions as to this claim, and with the discovery efforts which followed in the wake of the motion. I therefore find that Gates is entitled to the attorneys fees and costs which were incurred by it in the discovery efforts and the prosecution of this part (2) of the Newman claim.

Having observed these sanctions proceedings for several years, I am aware that it would be difficult, if not impossible, for Gates to separate from its total bill those fees and costs which are specific to the Newman claim. Discovery from each of the witnesses, for example, was frequently applicable to more than one of Gates' claims. In order to resolve this dilemma, I find that Gates is entitled to be awarded ten percent of the total amount of fees and costs which it incurred throughout the sanctions proceedings. The figure of ten percent no doubt exceeds the amount of fees and costs which Gates actually incurred on this claim, but any amount in excess of the true figure is awarded to Gates as a sanction.

Gates need not calculate the sum to which it is entitled. I find in later portions of this order that Gates was not justified in the filing and prosecution of the majority of its claims, and I award fees and costs to Bando in excess of ten percent. The figure of ten percent will be offset against any fees and costs awarded to Bando.

### B. Shredding at Itasca Facility.

In this claim, Gates alleges that employees of Bando at the Itasca facility, in violation of the court's order, shredded company records. The alleged records consisted of green bar computer paper which had been shredded into a trash bag located next to the computer.

On October 9, 1992, all of the lawyers and technicians arrived in Itasca, Illinois, to conduct a site inspection of the Bando facility there, and to copy hard drives on any computers. The Itasca computer was known as the AS400.

The only witness to testify on events which occurred in Itasca was Jack Harrington, who was Vice-president of Operations for Bando. Harrington related that the AS400 was located in a small room, which contained only the computer, a printer and the shredder. The AS400 contained all of the inventory and

pricing information for Bando, and this information changed continuously, literally by the minute, as sales and purchases were made and recorded. It also contained information on personnel, such as payroll and benefits. Materials would be printed if, for example, someone needed to review current sales information, or if someone needed information on a particular employee.

Harrington stated that he thought nothing of the presence of the shredded computer paper because it was there all of the time. Bando had a policy of shredding all of the daily business which was printed off of the computer so that it could not be retrieved by someone from the trash. When the Gates team and the Special Master arrived, Harrington directed them to the computer room, and explained the reasons for the shredded material, and explained further that whatever was on the shredded material was in the computer.

Rodger Wilson, counsel for Gates, initially argued that, technically, Bando had violated the court order. The Special Master considered the matter, but determined that because everything that had been shredded was a printout of information which remained in the computer no harm had been done. Harrington and counsel for Bando offered to Wilson the opportunity to take the bags of shredded materials if he desired. Wilson declined, and stated, according to Harrington, "Nah, we don't want them. Don't worry about it Jack." Gates now asks for sanctions for this alleged shredding of records.

Gates argues that it was "misled" by Harrington during the site inspection. Harrington claimed at that time that he knew the nature of the shredded materials in the bags; but in subsequent deposition testimony, Gates argues, he seemed to say that he did not examine every inch of the bags. Additionally, Gates argues that Harrington is a liar.

■ I find no evidence which suggests that Harrington lied or misrepresented any fact. I found Harrington to be credible. Gates' arguments for "lying" are premised upon the word games which lawyers play with witnesses. During one deposition, Wilson asked Harrington if he could make the statement that nothing but duplicate records were destroyed "prior from September 25th, '92, to my arrival in Itasca," a period of 15 days. Harrington answered no, but in light of the breadth of the question the answer seems obvious. During another deposition, Wilson pushed at Harrington's answers in this area by repeatedly stating, "you are under oath here, sir," and "you weren't under oath at the time" of the site inspection. Harrington answered that he did not know if "nothing but duplicate records were destroyed prior—from September 25th, 1992 to [Wilson's] arrival in Itasca."

Harrington may not have occupied the computer room full-time to observe every piece of paper which may have moved through the shredder, from September 25, 1992, until the site inspection team arrived on October 9th, but he knew the habits and practices of the company. The Site Inspection Order did not require Bando to shut down and conduct no further business. Bando was not required to lock the contents of the AS400 in place as of the arrival of the order. Nor was Bando required to stack and preserve all trash for two weeks in order for the team to have the opportunity to probe through it if it desired.

Bando was merely required to destroy no records. By preserving the contents of the AS400 in its usual business condition, Bando complied with the requirements of my order. The contents of the computer ebbed and flowed with the transaction of business, and Gates has presented absolutely *no* evidence which suggests that it was deprived of any records or information. The entire contents of the computer were at the disposal of the team. Additionally, there are as of this date a large quantity of boxes of records and documents at the Itasca facility which Gates asked to be set aside for further inspection, and no inspection has yet occurred.

■ I find that Bando extended an extreme degree of courtesy and cooperation to the Gates' team in its efforts to obtain and preserve information at the Itasca facility. The team was provided with office space, and was provided with coffee and donuts. Bando employees were diverted from their own ac-

tivities to assist Gates, at the expense of a number of hours of lost employee time to Bando. Bando made every effort to meet the needs and demands of the Gates team. When the court-appointed technician, Mr. Scheideman, lost a group of disks in the parking lot, they were retrieved by a Bando employee and forwarded to Mr. Scheideman. I do not see the negative picture of a dark and pervasive conspiracy which Gates has sought to paint for me.

I find that Gates' arguments with regard to having been misled by Harrington are pretextual, and were not advanced in good faith. Gates had no justification for making the claim that records were destroyed at Itasca. Bando is awarded its fees and costs which were incurred in connection with the defense of this claim.

### C. The Bowling Green Dumpster Incident.

Gates alleges in this claim that two officers of the Bowling Green manufacturing plant of Bando, James Blankenship and Matthew Adams, destroyed records by throwing a box of them into a dumpster on the day before the site inspection was to occur at that facility. Blankenship was manager of the Bando plant at Bowling Green, and Adams was manager of Human Resources.

Blankenship and Adams admit that a box of materials was thrown into the dumpster, but have testified that the box was found on the factory floor, and contained nothing more than waste materials, such as old catalogs. Gates presented testimony from a former employee, Mandel Stockton, who stated that he saw what he believed to be shredded material fall from the box when it was discarded. I received a day's worth of testimony from a physical engineer, who testified that he performed observations and calculations which were intended to demonstrate that Stockton could not have seen what he claimed to have seen.

Gates asks me to find that Blankenship and Adams are liars. I find that they were credible. I have concluded that they threw trash into the dumpster, not company records of any type.

Gates has argued here, as it has argued throughout these proceedings, as follows: parties employed by Bando admit to throwing away a box of material; no one can know what was in the box; testimony from the parties who discarded the material is insufficient to prove anything; therefore, Gates is entitled to an inference that the box contained material which would be harmful to Bando. If this were the law, discarding the trash would become a strict liability discovery offense. Parties could position an investigator at the trash receptacle for any opponent, and create any house of cards which is desired from the fact that material was thrown away. I do not find it to be a correct statement of the law.

As I found in my Conclusions of Law, Part V above, Gates has the initial burden to establish some *minimal* relevance of any discarded or destroyed materials to the circumstances of the litigation. A review of the cases which I have cited above indicates that, where sanctions were granted, the general nature of the destroyed documents or materials were known, if only to a limited extent. Sanctions are appropriate when something is not produced or disappears which is known to exist, which ought to exist, or which may reasonably be inferred to exist. Here, Gates has produced *no* evidence which reflects that records or data which ought to exist at Bowling Green no longer exist. The suggestion of Gates that the material which went to the dumpster was important records is nothing more than speculation.

During the site inspection, Gates passed over an enormous quantity of records, formulas and materials, but nevertheless set aside for preservation what has been represented by Bando to be a room in a warehouse which is full of boxes of material. None of the material has been examined. Gates admits that it has not begun to conduct discovery on the merits. Where Gates has no idea what materials are available to it, I am not persuaded that the company can claim harm from the discarding of a box of unknown materials.

Evidence exists which indicates that at the time of the site inspection at Bowling Green Gates was not even looking for the type of

materials which might be discarded in a box. John LaVigne, another of Gates' attorneys, stated in an affidavit of February 3, 1996, which was attached to a Notice of Judicial Admission filed by Bando on April 9, 1996, that the "primary purpose of the site inspections was to complete discovery related to the Chauffer claims." LaVigne stated that the Site Inspection Order which I entered did not permit Gates to seek evidence with regard to manufacturing processes, compounds or development information, and the team from Gates was therefore not even looking for such documents. However, Bowling Green was a manufacturing facility, and would contain almost nothing *but* information which related to manufacturing, processing or other development information.

Assuming that Gates was concerned primarily with the discovery of information which related to Chauffer, as LaVigne has stated, the position of Gates throughout the site inspection is puzzling. Bando has never denied that it sent Chauffer materials to other offices and to customers. Pursuant to an order from Judge Sparr, counsel for Bando provided the names and addresses of every known recipient of Chauffer, and counsel made frequent reports to the court on Bando's progress in obtaining the return of every disk which had been distributed. It would make little sense for employees of Bando to destroy evidence of Chauffer when counsel for Bando were cooperating in the return of such materials to Gates.

 Gates produced no information which reflected, or which might lead to an inference, that the material in the boxes which were discarded consisted of records of anything. I find that Gates had no justification for the bringing or prosecution of this claim. Bando is awarded its fees and costs.

### D. Kessinger's Use of a Spreadsheet.

 Gates alleges in this claim that John Minton, a former employee of Bando, observed another Bando employee, Gary Kessinger, working at his computer on a spreadsheet which, it is argued, belonged to Gates. Kessinger is another Gates employee who left that employ to work with Bando. In an affidavit which was provided to the court,

Minton stated: "I just looked at the formula and told [Kessinger] it looked awful complex. And [Kessinger] told me basically that it was a spreadsheet that he had used at Gates. And then I just let it drop."

A spreadsheet describes a particular manner in which lists of items are placed on a page, whether in rows or columns, for example. People can learn about spreadsheets from computer courses which are offered, and from computer programs for spreadsheets, such as Lotus, which are offered commercially. Gates offered no evidence which demonstrates that Gates developed or owned the particular spreadsheet upon which Kessinger was working, or owned the rights to *any* spreadsheets, for that matter. I have no evidence which shows that the data being placed on the spreadsheets by Kessinger was data from Gates. The evidence which was placed before me reflects only that Kessinger admits that he worked at Bando on a spreadsheet which he had "used" while at Gates.

 Gates has no claim for sanctions if Gates cannot establish that the spreadsheet at issue was owned by Gates, was a trade secret of Gates or contained data which belonged to Gates. Gates offered no evidence on any of these factors. I find that Gates had no justification for bringing the claim. Bando is awarded its fees and costs.

### E. Activation of Password Protection.

 Gates alleges in this claim that Bando activated "password protection" on the computers at Bowling Green on February 12, 1992. Gates asks that I view this activity, in the totality of circumstances, as evidence that Bando "tampered" with its computers in anticipation of litigation. The site inspection was conducted six months after the alleged tampering occurred. Gates does not argue that the addition of password protection is a destruction of evidence. Instead, Gates seems to argue only that it is a suspicious circumstance.

A "password," when added to a computer, merely personalizes the usage of a particular computer. Once added, only persons who know the password can enter the computer and do work on it. The use of password

protection is not only common in the business world, many users place password protection on their personal computers at home.

██ I fail to see how the addition of password protection can be construed as "tampering." Even if I view this matter in conjunction with the other allegations of destruction of evidence which have been brought by Gates, I still fail to see how the addition of password protection can be considered an act in furtherance of any alleged destruction. I find that Gates had no justification for bringing this claim. Bando is awarded its fees and costs.

### F, G, and H. Alteration of Menus.

Gates alleges in these three claims that the Direct Access menus were altered in the computers at Bando's Los Angeles and Bowling Green facilities on several different dates. As Gates points out, Direct Access is a commercial software program which, when installed, permits the user to access a particular program in a computer simply by pressing a single key, or by clicking the mouse on the selection. Gates argues that evidence of the alteration of a menu is evidence that a software program was deleted.

Wedig and Voorhees pointed out that examination of the computer merely provides evidence on the Direct Access usage log that a change was made to a menu. There is no evidence in the log which shows what particular changes were made to the menus in question. The type of change which is noted by the computer could be a change of no more than one character.

Gates centers its argument upon Chauffer. It argues that the timing of the changes on the menus gives rise to a logical inference that the various computer users were eliminating Chauffer, or another of Gates' programs, from their computers, or were eliminating all evidence of usage of Chauffer. One menu was altered in Bowling Green several days before issuance of the site inspection order on September 25, 1992; one was altered in Los Angeles on October 6, 1992, two days before the site inspection for Los Angeles; and two menus were altered in Bowling Green on October 6 and 12, 1992.

██ I am reluctant to find, in the circumstances of this case, that grounds exist which justify the imposition of sanctions. Admittedly, the timings of the alterations are suspicious, but I do not find that a "logical inference" can be made which connects evidence of the alteration of menus with an inference that the alterations were made to destroy or conceal trade secret evidence which was damaging to defendants. The alteration of menus is as consistent with ordinary computer usage as it is with the alleged intent to destroy evidence. More importantly, even if defendants were removing evidence of Chauffer from their computers, such actions should not subject them to sanctions.

My Site Inspection Order of September 25, 1992, directed defendants, simply, to destroy no records. Judge Sparr entered his injunction order on June 24, 1992, and he directed at that time that defendants were to cease all usage of Chauffer. He ordered Bando to initiate efforts to retrieve and return all copies of that program. After June 24th, Bando engaged in organized attempts to comply with Judge Sparr's order. Thus, if Bando employees removed evidence of Chauffer from their computers, as Gates has complained in this claim, they did nothing which should subject them to sanctions.

██ The inference for which Gates argues in this claim is not completely improbable. Although Gates has failed to persuade me that sanctions would be appropriate here, I find that the bringing of the claim was substantially justified. Each side shall pay its own fees and costs.

### I. Itasca: Deletion of Word Processing Files.

Gates alleges in this claim that after the Site Inspection Order was entered employees of Bando deleted word processing files at the Itasca facility. Bando does not dispute this fact, but argues that the evidence presented by Gates through Robert Voorhees establishes that every one of the deleted files was recovered. Gates disputes this argument.

The core of the dispute on this claim centers upon the interpretation to be given to a

brief bit of testimony by Voorhees. Voorhees testified as follows:

Q. Mr. Voorhees, you testified that word processing files were deleted from the Itasca administration computer; is that right?

A. Yes, sir, that's correct.

Q. How many were deleted?

A. Itasca—I am not certain I know the number exactly, sir.

Q. To your knowledge, was every one of those files recovered in its entirety?

A. From the information I have, I believe they were, sir.

The disputed phrase is "those files," which is contained in the last question to Voorhees. Gates argues that the words refer to "those files" which were actually *recovered* from the computer, not necessarily including files which had been deleted. Bando argues that the words refer to the files which were *deleted*, and then recovered. In this claim, I am asked merely to determine whether Voorhees made reference to one or the other.

In the first place, Gates has the burden of proof, and Voorhees is a witness who was called by Gates. Any ambiguities should be construed against Gates. In the second place, as the fact finder, I find that Voorhees testified that all *deleted* files were recovered. In the third place, if I viewed this portion of testimony in the abstract, without having been present at the hearing, I would conclude that Voorhees referred to all deleted, and not all recovered, files. The questioner had asked twice about deleted files, and, in this exchange, never about any non-deleted files.

Gates points out that Voorhees stated that he did not know the number of files which were deleted. Arguing from that point, Gates asserts that Voorhees obviously could not say whether all files that were deleted were, in fact, recovered. The questions and answers reflect that Voorhees testified, in effect: I do not know the number of deleted files, but I know that every one of them was recovered. To read the testimony in any other fashion is to strain the plain meaning of words.

In a footnote to its argument, Gates points out that 25 new files were stored in the word processing section of the computers at Itasca. Gates argues from this point that 25 deleted files were thereby destroyed. First, the Site Inspection Order did not prevent Bando from conducting business as usual. Obviously, as new letters, memos or reports were written by Bando employees, it would be considered ordinary business practice for them to be stored on disk. Second, 25 new files do not cover 25 deleted files, not as such. As pointed out by both Voorhees and Wedig, a single new document is not necessarily stored in a single place on a hard disk, but may be stored in several different places, all at random. Arguably, 25 new files may overwrite no deleted files at all.

In sum, Voorhees testified that all deleted files were recovered in their entirety. Gates presented no evidence to the contrary. Bando was not prohibited from continuing its normal business activities. Gates cannot show any harm or prejudice from the deletion of files at Itasca. I find that Gates had no justification for the bringing of this claim. Bando is awarded its fees and costs.

*J. The Switch of Hard Drives at Bowling Green.*

Gates alleges in this claim that the hard drive in Gary Kessinger's computer at Bowling Green, known as the 2007, was completely overwritten by the hard drive from computer number 1100A, which was used by Pat Smith, a secretary for Bando. This overwriting was done by Ray Hampton, the computer technician for Bando at the Bowling Green facility. In Gates' view, the overwriting of Kessinger's computer proves an intent by Bando to destroy the evidence which was contained on it.

Bando does not dispute that the hard drive of 2007 was overwritten by the hard drive which was in 1100A, but argues (1) the transfer of information was done for the purpose of accomplishing a repair of Smith's computer without interrupting her work, (2) 2007 was a "utility computer," not Gary Kessinger's, and (3) the transfer occurred on Sep-

tember 8 or 9, 1992, prior to the filing of the motion which requested the site inspection, and before any Bando employee knew a site inspection was even being considered.

(1) Gates' attack in this claim is premised upon their view that Pat Smith testified truthfully, and Ray Hampton testified falsely. Smith testified that she was never informed or aware that her computer was replaced, with its programs and memory intact, while it was repaired. In its Reply brief, Gates quoted deposition testimony which reflects that in August, 1993, Hampton stated that he could not explain why "the front desk computer," belonging to Pat Smith, would be duplicated "on any of the other 16 computers at the Bando manufacturing facility." Hampton stated, "I can't explain why the entire thing would be an exact duplicate of another entire disk. No, sir, I cannot."

At the September, 1994, sanctions hearing, approximately one year later, Hampton testified that in September, 1992, he had copied files from Pat Smith's computer onto computer 2007 so that she could use computer 2007 while Hampton repaired her computer. Hampton stated he did this by using a device called "Laplink," a cable which attaches between two computers, and allows the transference of information from one computer to the other. Although I found Hampton to be generally credible during the sanctions hearing, his testimony of 1994 tends to be impeached by his memory of events as he reported them in 1993.

(2) If computer number 2007 did not "belong" to Kessinger, the impeachment falls short of its task. Gates argues in its Reply brief that, "[a]lthough others also used this computer, this is indisputably a computer used by Gary Kessinger." At p. 100, n 56. During the sanctions hearing, Hampton testified that the computer was on a cart, so that it could be rolled anywhere in the facility. It was available for use by Kessinger, but it was used by others as well. In fact, Hampton testified that he believed that the 2007 had an emulation card installed in it which permitted the computer to "emulate" the AS400. With the emulation card, the 2007 was used in the conference room as a tool for training employees on the AS400. Addition-ally, the computer was used by the court-appointed technician, Mr. Scheideman, during the site inspection. I do not find from the evidence that the 2007 was a computer which "belonged" to Kessinger.

(3) Bando argues that the transference of information occurred, according to the testimony of Voorhees, on September 8 or 9, 1992, which was prior to the filing of the motion for site inspection. Gates argues that there was other testimony from Voorhees which reflected that data might have been downloaded in September from 1100A to some other medium, such as floppies, and then loaded unto 2007 sometime after that. Looking at the totality of Voorhees' testimony, I find that the transference of information occurred on September 8 or 9, 1992.

Copying to disks in these circumstances would have required the use of approximately 40 of them. This activity would have been so time-consuming that it defies common sense to suspect that it occurred. Hampton was sufficiently credible that I believe him when he states that the transference occurred through the use of Laplink. Thus, I find no evidence to support Gates' theory that Hampton downloaded the 1100A to disks around September 8 or 9, 1992, and then overwrote the 2007 at a time after the site inspection was announced. Instead, I find that the transference of information occurred before anyone knew that a site inspection was to occur.

I find that the transference of information about which Gates makes complaint occurred between Pat Smith's computer, and a computer which was available for use, and was used, by anyone employed at Bando, including Kessinger. Viewing the evidence in this fashion, I find no evidence of an intent to cover over any computer work which may have been done by Kessinger. Therefore, there is no evidence that the transference was an intentional coverup in anticipation of such an inspection.

Despite my conclusion, I find that the total overwriting of one computer over another is reasonably likely to prompt a need for investigation of the circumstances which caused such an anomaly, and the totality of

evidence which surrounded this incident was only provided within the context, or within the time frame, of the sanctions hearing. I therefore find that Gates was substantially justified in bringing this claim. Gates simply failed to persuade me that hard drives were switched for the purpose of concealing evidence. Each side shall pay its own fees and costs.

### K. *"Wiping" of Computers at Bowling Green.*

■ Gates alleges in this claim that the computers at Bowling Green were "wiped", i.e., all data was erased, by Ray Hampton prior to the site inspection. In support of the claim, Gates points to the facts that Mr. Scheideman, the court-appointed technician, found no deleted files on any of the 16 Bowling Green computers, with the exception of one; yet some employees of Bando testified that they had deleted files in the ordinary course of business. Therefore, Gates argues, there had to have been deleted files on the computers, but the computers were wiped clean.

The experts, Voorhees and Wedig, agreed that computers can be wiped clean through the use of either the Wash Disk feature of a program called X–Tree Gold, or through the Wipe Info feature of Norton's Unerase. X–Tree Gold was installed on the computers at Bowling Green, but it performs functions in addition to the cleaning of disks—such as the display and maintenance of computer files.

The only testimony which was offered during the sanctions hearing on this claim was that of Robert Wedig, Bando's expert. Gates failed timely to designate an expert of its own, and therefore offered no expert testimony in opposition to Wedig. Instead, Gates attempted to prove this claim by presenting arguments in opposition to Wedig's opinions on this subject. I found Wedig to be extremely learned, and I was not persuaded by argument from counsel to reject Wedig's findings and opinions.

Wedig reached the opinion that Mr. Scheideman erred in the operation of Norton's Unerase, and that proper operation of Norton's would have revealed that the computers, in fact, contained deleted files. He offered a number of facts in support of this opinion.

One, when Wash Disk of X–Tree Gold is used for the purpose of cleaning a disk, it leaves a footprint, so to speak. It begins by creating a file named $$TEMP$$.$$$; it overwrites all of the spaces of the computer with 1's; and it ends with the deletion of the program. If any Bando computer had been wiped with Wash Disk, Scheideman would necessarily have found the one deleted file: $$$TEMP$$.$$$.

Two, when either Wash Disk or Wipe Info are run, they wipe over everything except the directory entries. If Scheideman had run Norton's properly, he would necessarily have found the directory entries for any deleted files. Scheideman stated that he found no directory entries.

Three, no one disputed the fact that some of the employees at Bando deleted files after the date when Hampton allegedly utilized Wash Disk. If Scheideman had operated Wash Disk properly, these files, at least, would have been recovered, but they were not.

Four, in one computer, Scheideman claimed to have found no deleted files. However, Wedig researched the same computer and found 34 deleted files.

Finally, Wedig pointed out that the failure of the technicians to have made an "image backup" of the hard drives of the computers hampered any investigation. With an image backup of the computers, an investigator could examine the hard drives in order to see whether or not the disks were filled with the distinctive patterns of "1's" which marks the use of Wash Disk. The presence or absence of 1's in every unallotted space would be almost conclusive evidence that the computer was, or was not, wiped clean. In the absence of an image backup, this evidence was simply unavailable.

Gates argues that Bando should be held responsible for the absence of an image backup. I have already noted that I reject that reasoning. Gates was the moving party, Gates initiated the investigation and Gates determined the manner and parameters of

the investigation. Gates failed to obtain the type of evidence which may have eliminated the need to debate some of the various issues which were raised during these sanctions proceedings.

 Mr. Scheideman was appointed by the court to conduct the search and copying which was done at Bowling Green, but the court is not required to ratify or adopt his findings or conclusions simply because he was court-appointed. I find from the evidence that the parties who actually initiated and controlled the searches which were conducted at the various site inspections were the lawyers from Gates. They knew the type of search they were commencing, and they had a reasonable idea of how they intended to use the results of the various searches. As I have noted, the circumstances required that Gates utilize the technology which would produce the most complete and accurate picture of the evidence, and Gates failed to ensure that this was done. Where any uncertainty exists with regard to the results of this failure by Gates, Gates should suffer the consequences of that failure.

 I find that Gates has failed to prove that the computers at Bowling Green were wiped clean by a program such as Wash Disk in order to destroy evidence prior to the site inspection. Although I have found that Scheideman's search was conducted incorrectly, I find that Gates was substantially justified in relying upon his efforts and conclusions, and was therefore substantially justified in the bringing of this claim. Each side shall pay its own fees and costs.

### L. Kessinger's Theft of Computer Disks.

Gates alleges in this claim that Gary Kessinger stole several disks from the Special Master during the site inspection at Bowling Green. Gates asks the court to sanction Bando for this conduct through a negative inference or presumption.

 Bando does not dispute that Kessinger removed several disks from the possession of the Special Master. No one knew of this event until ten months later, when Kessinger approached his supervisor, James Blankenship. In an emotional confession, Kessinger related to him what he had done. Kessinger told Blankenship that he had stolen the disks because he believed they were personal property. He told Blankenship that the disks contained blank form templates, and that he had acquired them when he purchased a computer from a friend named Ben Furman. The templates were on Furman's computer when he bought it. Guilt and worry had prompted him to seek out Blankenship, and reveal what he had done.

Blankenship notified counsel for Bando. Counsel obtained possession of the disks. Shortly afterward, counsel notified both the court and Gates of what Kessinger had done, and hand-delivered the disks to the court. Gates has received copies of these disks.

Ordinarily, receipt of the disks by Gates would, or should, resolve the dispute. Gates, however, seeks to persuade the court that Kessinger is a liar, that his explanations for stealing the disks should be rejected and that Gates should be granted an inference. Gates wants the court to infer that Kessinger has never given the disks which were stolen to his attorney or anyone else. Gates argues that it is prejudiced by the original theft because only Kessinger knows what was on the disks, and only he knows whether he provided the disks which he claims to have stolen. Gates argues that it, and the court, should not be compelled to rely upon the word of a liar. Kessinger never testified at the sanctions hearing.

I fail to see any logic in the position which is advanced by Gates. The only harm about which complaint can be made is the ten-month delay in receiving the disks, and Gates makes no mention of any prejudice as a result of that delay. Kessinger gave the disks to counsel for Bando, and counsel in turn provided them to Gates. How these circumstances can be changed by the fact that Kessinger is a liar, if he is, escapes me. Indeed, the opposite inference would seem to flow from Kessinger's actions. In coming forward, his actions and statements were against his interests. Such actions and statements are ordinarily cloaked with a presumption that they are true. If Kessinger were the thief and liar described by Gates, he

would never have returned the disks at all, and no one would be the wiser.

 I find the arguments of Gates in this section to be baseless. Gates received the disks, even if they were received ten months after the site inspection. Gates makes no complaint about the delay, and has proved no prejudice. I find that Gates lacked justification for bringing this claim. Bando is awarded its fees and costs.

### M. Concealment of Video Tapes.

Gates alleges in this claim that a number of videotapes were removed from the premises of the Bowling Green facility just prior to the site inspection, and were not available for review or preservation. Bando does not dispute that the tapes were removed by one of the Bando employees. However, once counsel for Bando learned of the fact, the tapes were immediately retrieved and provided to Gates.

 Ann Helman, one of the managers at the Bowling Green plant, claimed responsibility for removal of the tapes. She testified at the sanctions hearing. Gates argues that her testimony is questionable. I found her to be very credible.

Helman stated that she did not believe that the videotapes were "company records," or were subject to the Site Inspection Order. She described the videotapes as containing such matters as company meetings, company parties, company picnics, orientation videos for new employees, training films, safety lectures, and quality control meetings, known as QC meetings. At QC meetings, employees met together in a room and brainstormed new ideas to make things work better. Helman believed that employees were relatively comfortable in the knowledge that other employees might view them on these videos, but that they would be embarrassed if outsiders were to view them. Helman discussed the videotapes first with another plant manager, Matt Adams, the Director of Human Resources, and then removed them to the garage at her home.

Bando maintained two libraries of videotapes: one was kept in the office area for human resources, and these videos contained business materials of a confidential nature. The other library of videos was kept in the employee cafeteria, and contained general information which was not confidential. Any employee could check out a video from the cafeteria library. Helman removed the set which was shelved in the cafeteria. The other set remained on the premises, and was available for viewing at the time of the site inspection.

Contrary to Gates' assertion that Helman's actions represent a "challenge to the integrity of the court," I regard this incident as an ordinary discovery problem. Helman reasonably believed that the videos were not subject to the site inspection, and, at worst, she may have been mistaken. The materials were later produced.

Gates is again heard to complain that they can never know if they received *all* of the videos, or all of the contents of the videos as they were on the date of the site inspection. The only evidence which could conceivably support a claim that Gates did not receive all of the videos is a comment by Helman which may be construed to mean that she did not keep the videos in a locked compartment, and did not watch them at all times. This is not a police investigation, and I am not concerned with a strict chain of custody. Helman removed the videos from the shelves, stored them in her garage, and replaced them later. They were then produced for Gates.

Gates points out that, after Helman returned the videos, and prior to reporting their temporary absence, some were taped over, thereby destroying "evidence." Testimony from plant employees established that plant meetings were occasionally videotaped in order that employees on other shifts would be able to listen to the remarks at the meeting, and learn, for example, about employee awards, new employee benefits or changes in insurance requirements. Later, that particular videotape might be used for another meeting, and taped over.

 Unless there is evidence to the contrary, when materials are produced for inspection the good faith of the tender is presumed. Gates attempts to put a sinister spin

on the events which underlie this claim, but the events appear quite innocuous to me. There was confusion over whether the videotapes were "company records" or not, but the confusion was reasonable and in good faith. There was confusion over whether the videotapes were subject to the site inspection, and this confusion was reasonable and in good faith as well.

Gates was provided access to all of Bando's records and files, and has set aside for later review literally millions of pages of documents. In light of this overwhelming production and cooperation by Bando, Gates' complaint over this matter appears to be much ado about nothing.

Gates itself admits, according to the LaVigne affidavit discussed above, that the order for the site inspection was limited to a search for materials which were associated with Chauffer, the computer program. At the time of the site inspection, Gates had no evidence that these videotapes contained anything about Chauffer, and the LaVigne affidavit reflects that Gates was aware that videotapes were not covered by the Site Inspection Order. The confidential videotapes which were held in the office of Human Resources were not examined by Gates, or held for viewing or copying. There is no evidence that the "cafeteria videotapes" would have been considered by Gates to be any different, even if they had been present during the site inspection.

 I find nothing in the evidence which supports Gates' claim that Bando concealed or destroyed evidence by temporarily removing the videotapes from the Bando premises. I find that Gates lacked justification for bringing this claim. Bando is awarded its fees and costs.

### N. Segregation/Concealment of Files.

Gates alleges in this claim that employees at the Bowling Green facility segregated certain files from their work area, and thereby concealed them from Gates. Gates admits that the files were returned to their original location, but argues that it can never know whether all of the files were returned, or whether the same contents were in the files when they were returned.

 Blankenship, the chief manager of the Bowling Green plant, testified during the sanctions hearing that when he learned about the Site Inspection Order, he did not believe that the order would allow Gates to inspect material which he considered to be Bando's "proprietary information." He therefore directed the employees under his supervision, which included Gary Kessinger, to go through all of their files, and to segregate all files or materials which were proprietary to Bando. Newman did not work at the Bowling Green facility, but happened to be present at the time, and assisted in the effort.

The employees began the process of sorting one set of files from the other, and made a log of the "proprietary files" as they proceeded. Newman suggested to Blankenship that he was wrong in his interpretation of the order, and Blankenship contacted counsel for Bando in order to obtain some guidance. Counsel advised them to segregate no files, but to leave everything as it was ordinarily kept. Blankenship reversed his order, and directed the employees to return the files to their original place. This was done.

I do not find Blankenship's reaction to the site inspection to be unreasonable. He is not an attorney, and he was admittedly puzzled by the thought that Gates, the dominant competitor in the field, would be able to probe through files which contained Bando's trade secrets. When he learned differently from counsel, he responded appropriately.

I view the evidence as showing nothing more than that Bando employees moved files from point A to point B, and then moved them back again. Gates has no evidence to the contrary.

Gates argues here similarly to its arguments in other contexts: Newman and Kessinger are liars; therefore, the court should infer that all of the files were never returned, or certain contents were removed. The argument has nothing to do with the temporary movement of files; it relates only to the fact that Kessinger and Newman touched them.

In order for Gates to meet its minimal burden to prove that relevant documents

were destroyed, however, Gates needs to present more than a bald accusation that certain employees were liars, and/or that certain employees had access to files. Gates presented no evidence which reflects that any files or contents disappeared, and Gates has not convinced me that any parties "lied" in connection with the temporary movement of files.

■ This whole claim seems to consist of nothing more than nit-picking by Gates' attorneys over portions of testimony. From my view of the totality of the evidence, the employees of Bando at Bowling Green conducted themselves appropriately, and made available to Gates all of the files and documents which were on the premises. I find that Gates was not justified in the bringing of this claim. Bando is awarded its fees and costs.

### O. Shredding by Koji Ikoma.

■ Gates alleges in this claim that Koji Ikoma, an engineer in the Bowling Green plant, shredded materials prior to the site inspection. Gates only learned about this alleged shredding incident some eighteen months after the fact, when Allen Hanano, the chief executive officer for all of the American entities of Bando, came under investigation from his superiors on various matters, including allegations of embezzlement. Hanano began negotiating with Gates on his own, to secure his own individual interests, and in the midst of these events he released a copy of a tape recording of a conversation between himself and Newman. In the recording, Newman indicated that he had some knowledge of shredding by Ikoma just prior to the site inspection. Hanano's maneuvers are discussed in more detail in Part Q below. Hanano was ultimately terminated by Bando.

Bando does not dispute the shredding by Ikoma, but argues that Ikoma shredded only waste or personal materials. Gates argues that it is entitled to an inference that Ikoma destroyed relevant documents and records because Bando cannot prove by clear and convincing evidence that the shredded materials were *not* relevant documents and records.

Ikoma testified, through an interpreter, that he destroyed no business records or documents, but merely cleaned up his desk by eliminating such materials as old scratch paper, catalogs, industrial magazines and papers, belt samples, raw material samples, chemical samples, devices and parts for machinery, tourist information, hotel directory, letters and Christmas cards. Gates argues that Ikoma is a liar. I found him to be very credible.

Gates' claim is premised upon two questionable propositions: (1) that Bando has the burden to prove by clear and convincing evidence that Ikoma did not destroy evidence, or relevant materials, and (2) assuming the accuracy of the first proposition, that the word of a witness is insufficient to establish the burden of proof. I do not agree with either proposition.

(1) The discussion in part "C" above is relevant to the issues here. In part C, it was undisputed that two officers of Bando threw the contents of a box into a dumpster. Gates argued that it devolved upon Bando to prove by clear and convincing evidence that the material did not consist of business documents or records. I held that the initial burden was upon Gates to establish some minimal relevance of destroyed material. That same holding applies here.

The Site Inspection Order which I entered did not prevent Bando employees from discarding trash or waste. It ordered them to destroy no records. In today's world, shredding has taken on a sinister connotation. Perhaps disputes would have been curtailed if Ikoma had merely pitched his trash into a nearby receptacle, rather than to have shredded it. Perhaps not, as evidenced by the dumpster incident.

Gates has presented no evidence from which an inference might be drawn that Ikoma shredded business records or documents. The only evidence possessed by Gates at the time it initiated this claim was the transcript of the surreptitious recording which had been made by Hanano. During the conversation, Newman states nothing more than that he believed that Ikoma was just cleaning up, and was shredding clutter from around his desk. Newman was unaware that the con-

versation was being taped, and he was making his comments to an employer, Hanano, who was attempting to collect evidence which he could sell to Gates.

No witness testified that materials which would ordinarily be found at the desk of a person who occupied Ikoma's position were not there. On the other hand, the inventory which was created by technicians for Gates reflects that an enormous quantity of technical data and records were viewed and logged, but were not copied. Indeed, one of the items associated with Ikoma's station was a book which contained every formula for the processing of rubber at the Bando plant. Gates ignored it during the site inspection, but determined that it was extremely important by the time that Ikoma testified in court. I find that Ikoma made available to Gates every file and notebook of technical data which he possessed.

(2) Gates has directed me to no case or authority which holds that the testimony of a witness is, in itself, insufficient to rebut a claim that destroyed materials were important or relevant. Gates cites me to two cases in its Reply brief: *Alexander v. National Farmers Organization,* 687 F.2d at 1205, and *Capellupo v. FMC Corporation,* 126 F.R.D. at 547. These cases reflect nothing more than the fact that the credibility of witnesses is an issue which must be made on a case by case basis. In some circumstances, witnesses will be believed; in others, they will not.

In the circumstances of this case, I believed Ikoma. There was certainly no evidence presented which prompted me to disbelieve him. The attacks on his credibility by counsel for Gates were merely a reflection of cynical suspicions of otherwise normal activities, such as the attorney comment which implied that Ikoma "suspiciously timed" his shredding for "late at night." One wonders how late it must have been, since Gates lists three other people who were there to observe the shredding.

 Gates presented no evidence from which I could infer that Ikoma shredded any materials which could be considered "evidence," or relevant business records. The only evidence which Gates ever possessed

was the transcript of the taped conversation, and the transcript proves almost nothing. I find that Gates lacked justification for bringing this claim. Bando is awarded its fees and costs.

*P. Concealment of Computer by Ikoma.*

 Gates alleges in this claim that Koji Ikoma concealed from Gates during the site inspection his laptop computer and some disks. The laptop computer was completely Japanese, with Japanese lettering on the keyboard and display. The computer contained no hard drive, but Gates argues that the court should infer that Ikoma's disks contained relevant material which was destroyed by overwriting after the site inspection.

Bando learned about Ikoma's laptop at the same time that it learned that Helman had taken videotapes off the premises, some ten months after the site inspection. Counsel for Bando immediately informed Gates in a single letter about the videotapes and Ikoma's laptop, and made these items available to Gates.

Ikoma testified that the laptop had been given to him by another Japanese employee of Bando. He stated that he treated the computer as his personal property, and used it at home as well as at work. At home, for example, he played computer games on it with his child, he kept golf scores from Japanese competitions, and his wife used the computer for recipes.

Ikoma stated that he did not routinely keep anything on any disk. It was his practice to write something, print it and then use the disk for another matter. He would use the computer, for example, to do a statistical analysis of data, type a report or prepare a letter or document for a colleague. After printing the material, the disk was available for other use. At the time of the site inspection, he had some disks in his desk, some in the trunk of his car and some at home. Gates did not copy the disks which were found in his desk.

Gates argues that the computer was not Ikoma's personal property, but belonged to

Bando. According to Gates, if the computer belongs to Bando, everything which Ikoma does upon it is "business" related. However Ikoma came into possession of the laptop, I am persuaded that Bando does not claim an ownership interest in it, and that if Ikoma were to leave employment with Bando he could, and would, take the laptop with him. Ikoma reasonably believed the computer to be his personal property, and treated it as such. His belief that it was not a necessary part of the site inspection was a reasonable one, because the Site Inspection Order exempted personal property from its requirements.

There is no evidence from which I can conclude that Ikoma used disks to store data. He used the laptop in the same fashion that one would use a typewriter: to type a letter for printing, for example, but not for saving. Gates asks me to find that the overwriting of disks by Ikoma between the time of the site inspection and the time the disks were provided to Gates was done intentionally, and for the purpose of concealing evidence from Gates. I decline to make such a finding. I find, instead, that there is no evidence to suggest, imply or infer that anything of importance or permanence was stored on any disk owned by Ikoma. Instead, the overwriting which occurred was done in the ordinary course of Ikoma's computer usage, and without intent to conceal anything.

■ Gates never presented any evidence which would satisfy its minimal burdens to show that Ikoma stored business records or documents on disks, or that he had a duty to preserve the disks from overwriting. I find that Gates was not justified in the bringing of this claim. Bando is awarded its fees and costs.

### Q. Kessinger–Newman "Agreement" to Commit Perjury.

■ Gates alleges in this claim that Kessinger and Newman had witnessed Ikoma shredding documents, and that they agreed between themselves that, if asked, they would say nothing about it. Gates argues that this "conspiracy" to conduct a "coverup" succeeded for two years, and only came to light when Gates received a transcript of a tape recording which had been made by Allen Hanano of a conversation at his home with Newman on December 5, 1993. Hanano taped the conversation, but Newman never learned that the conversation had been recorded until the tape was revealed during this litigation. Because of the coverup, Gates argues, it lost the opportunity to depose witnesses to the Ikoma shredding who had fresh memories of the incident.

In part "O" above I found that Gates failed to prove that Ikoma shredded anything which was relevant or important. Because there was no shredding incident of any consequence, there could be no coverup. Additionally, the circumstances of the tape recording have caused me to place very little value in it. Hanano was the chief executive officer for Bando, but in late 1993, as Gates notes in its Reply brief, his relationship with the company was falling to pieces. The details which were provided to the court were sketchy, but sufficient to show that during the period of the tape recorded conversation Hanano was being accused by Bando officials of embezzlement. He resigned from the company at some point after the tape recording.

The questions which Hanano asked of Newman during the taped conversation, and the manner in which he posed them, reflect an intent on his part to set something up, so to speak. And the answers by Newman reflect the other side of the coin, an employee who responded to his boss in a manner which was calculated to please the boss.

After leaving Bando, Hanano negotiated with Gates, and offered to provide testimony and information in exchange for a dismissal and release of the claims in the suit against him individually. Thus, as counsel for Newman notes, there is every reason to believe that the tape recording of the conversation between Hanano and Newman was part of Hanano's efforts to develop material for use in negotiations with Gates. Ultimately, some type of agreement was, in fact, reached between Hanano and Gates, and all claims against Hanano have now been dismissed.

In the tape recording, Newman told Hanano that he saw Ikoma at the shredder, but

that it appeared that Ikoma was merely cleaning his desk, "not wanting to get caught or be embarrassed by an unclean or cluttered desk." Thus, even in a conversation in which Newman is allegedly revealing everything, Newman states only that he believed that the materials which Ikoma shredded were innocuous.

Hanano steered the conversation in such a way as to gain comments from Newman which reflected that Newman and Kessinger had agreed that, if asked about Ikoma, they would "say nothing." However, in his own deposition, Kessinger testifies only that he saw Ikoma walking away from the shredder, and that he had no idea what he was putting into the machine. Ultimately, the so-called conspiracy is seen to involve, at best, nothing more than two employees who observed Ikoma shredding the clutter from around his desk, as revealed by Newman while he was informally shooting the breeze with his boss.

Even if it were true that Newman and Kessinger had agreed to "commit perjury" if asked about Ikoma, such an agreement, standing alone, is not sanctionable conduct. In order for there to be a "coverup," there must be a duty to speak, and silence in the face of such duty. Gates has pointed to no deposition testimony of either of these employees which reflects that they were ever asked about Ikoma, and then lied or said nothing. Finally, neither Newman nor Kessinger had a duty to volunteer to Gates, without being asked, their respective views of Ikoma at the shredder, particularly where one of them would say that he merely saw Ikoma walking away from the shredder, and the other one would say nothing more than that he believed Ikoma was shredding the clutter from his desk.

█ I place very little weight on the tape recording, and it appears to be little more than idle chatter between an employee and his boss. I find that Gates never possessed any evidence which supports their allegations of a coverup. The claim was brought without any justification. Bando is awarded its fees and costs.

## R. Destruction of Red Logbook.

Gates alleges in this claim that a Bando employee named Chris Trosper found a red logbook in the trash at Bowling Green, and that the logbook was concealed or destroyed by James Blankenship. Blankenship received the book from Trosper, but he allegedly lost it. Gates argues that the red logbook was destroyed in violation of the Site Inspection Order, and that Gates is entitled to an inference that the materials in the logbook would have been helpful to Gates.

Trosper is a Bando employee who *did* seek out one of the lawyers for Gates, and volunteered to the lawyer the information which forms the claim with regard to the logbook. Bando does not dispute that the logbook was found, provided to Blankenship and lost by him. Bando argues that Gates was not harmed by the loss of the book.

█ The red logbooks were described by a supervisor for Bando, Sharon Hall, and a sample logbook was admitted into evidence during the sanctions hearing. Hall testified that the logbooks were used by workers on the factory floor, and were a "message tool" for one shift to communicate with the next shift. Problems or questions with regard to machinery, for example, would be noted in the logbook for the next shift to take note. The messages were frequently nothing more than ordinary pleasantries, such as "have a good day." The books contained no formulas or specifications. Bando had no policy with regard to keeping or discarding the logbooks.

The lawyers for Gates and Bando fought mightily over the quality of Chris Trosper as a witness. Bando pointed out that she had been demoted, was a disgruntled employee and was moved to testify in such a way as to hurt Bando. Gates elicited testimony which reflected her generally positive qualities. I have found it unnecessary to resolve this particular dispute. Whether Trosper is credible is irrelevant, because I find that evidence exists which reflects that the logbook contained nothing of importance.

Additionally, Gates received full and complete access to all relevant documents and records. Paul Reinbolt was the Operations Support Manager for Bando, and during the

sanctions hearing he testified that absolutely everything having to do with the production process at Bando was made available to Gates, and was there for inspection during the site inspection. Reinbolt directed counsel for Gates, Jay LaVigne, to the formula books, the daily production logbooks and some old "red logbooks," including the one which was described by Trosper. None of these was copied or preserved for later examination. Among the items passed over by LaVigne was a volume which was called "the master book," and which contained everything which anyone would want to know in order to make any of the products manufactured by Bando at that plant. I find that Gates received a high degree of cooperation from the production staff of Bando, and received the opportunity to review or preserve anything and everything.

■ The only reason Gates is moved to complain about the loss of one red logbook is the fact that Chris Trosper happened to find one in the trash, and searched to find a Gates lawyer to receive the book and her story. The red logbooks held no interest to Gates' attorneys while they conducted the site inspection, and having seen a sample logbook during the sanctions hearing Gates has still offered no reason at all as to why the "lost logbook" would hold any interest to Gates, not even some minimal relevance. When a representative sample of a book or document is available, it is no longer appropriate to attempt to end the argument with the refrain, "we will never know." The court and Gates were provided with such a sample. Gates knew the general contents of the logbooks, and passed over every one of them. Gates now wishes me to find or infer that the one lost logbook contained information which was beneficial to Gates, or damaging to Bando. I see no basis for such an inference. I find that Gates lacked justification for bringing this claim. Bando is awarded its fees and costs.

## X. THE "GATES MARKETING STRATEGY" DOCUMENT

Both Gates and Bando filed motions with regard to the "Gates Marketing Strategy" document long after the sanctions hearing

had been concluded. The motions, however, related to events which had occurred during the sanctions hearing.

On November 1, 1994, in the midst of the second segment of the sanctions hearing, Gates announced in open court that it had reached a settlement with Allen Hanano. As part of the settlement, Hanano had provided Gates with certain information. Among the information Hanano provided was a document which was referred to at the time by counsel for Gates as "the Gates strategy document ..., which is the heart of their product strategy, marketing strategy for the next decade." To describe the importance of the document, Counsel stated that it outweighed all other documents in the case "put together." The Marketing Strategy Document described the intrusions which Bando, and other Japanese competitors, were making into the industrial belt market, and targeted Bando as the key competitor.

Ten months later, Gates initiated the motions on this matter by filing a motion entitled "Motion to consider Additional Evidence Previously Offered" in support of its claim for sanctions. In this motion, Gates alleged that it had served discovery requests upon Bando which asked for "all Gates' documents," and Bando had withheld the strategy document. Gates argues that this incident is one further discovery violation by Bando, constituting willful concealment of critical information, and asks that I add this violation to the list of matters for which Bando should be sanctioned.

Bando responded to the motion by arguing that its failure to produce the document in discovery was "inadvertent," that no evidence of confidentiality appeared on the document and that the document should be considered a "minor issue," not worthy of any sanction. It then filed its own motion against Gates, asking for "Sanctions Against Gates for Failure to Produce Document Responsive to Multiple Discovery Requests." In its motion, Bando pointed out that in discovery requests dating back to 1993 Bando had asked Gates, in four separate motions, to produce all documents "relating or referring to Bando Chemical;" the files of all competitors which had been identified in deposition testimony by an officer of Gates, including

Bando; all "world-wide competitor files;" and "all regional, national or other strategic or tactical business plans." Bando complained that Gates failed to produce the marketing strategy document in response to these four requests.

Gates responded to Bando's motion by arguing that the strategy plan was not really "critical and important," and was merely a study of "strategic options," rather than a "strategic and tactical business plan." Therefore, Bando did not present a request which would specifically require Gates to produce this particular document. Additionally, Gates pointed out that it had produced thousands of pages of documents in response to each discovery request, and that the volume of production must certainly demonstrate its good faith efforts to comply with discovery— perhaps overlooking the irony of its use of an argument which Gates continually scorned when the same argument was made by Bando. Gates noted that it never intended to produce the document in response to any inquiry, because Gates had "sought to maintain [it] solely inside the company."

■ The attorneys for both Gates and Bando should be embarrassed at the hypocrisy of their arguments. That Gates had the marketing strategy document was discoverable, and it should have been produced. That Bando had the same document was discoverable, and it should have been produced.

I decline to enter into the verbal disputes and word games which surrounded this particular discovery dispute. I do not see any prejudice or harm to either party. Alternatively, each side's harm is offset by the harm to the other, and the issue is resolved by calling it a draw. Gates' Motion for Sanctions as to Bando's failure to produce the marketing strategy document is denied. Bando's Motion for Sanctions as to Gates' failure to produce the same document is also denied. Each side shall pay its own fees and costs.

### XI. BANDO MOTION FOR SANCTIONS: RELATED LAWSUIT

■ In a motion which was filed on April 9, 1996, Bando asks that I impose sanctions against Gates for the failure of Gates to inform Bando that a related lawsuit had been filed in state court in Arapahoe County against Gary Kessinger. Bando argues that Gates' failure to notify Bando of the suit is a violation of local rule. D.C.Colo.LR 7.1(K). In its response, Gates admits that the lawsuit against Kessinger is a related case, but Gates points out that the local rule requires that the names and addresses of all counsel be provided with notice of a related lawsuit. Gates argues that it is not required to notify Bando until it learns the name of the attorney who will represent Kessinger, and no attorney has entered an appearance. The lawsuit was filed against Kessinger in December of 1995. By April 9, 1996, Gates had still not notified Bando that the suit had been filed.

Gates may be technically correct in its argument, but whatever happened to "professional courtesy?" Kessinger has been sued, in part, because of his alleged role in the unauthorized removal of the Marketing Strategy Document from Gates when Kessinger left his employment with Gates. Although Bando attorneys have not represented Kessinger since the date when Kessinger took the computer disks, it is conceivable that an indemnification agreement between Kessinger and Bando is in place. For whatever reasons, Bando has a need to know about the filing of related lawsuits as early as possible. I think that counsel for Gates owed to Bando the courtesy of a letter in conjunction with the filing of the lawsuit, whether the existence of counsel was known or not.

Gates' argument is technically correct. I find no violation of the rule, and I find that Bando has suffered no harm as a result of the delay in notification. Each side shall pay its own fees and costs.

This is the second time that Gates has filed a lawsuit in state court against former Bando employees, alleging claims which were similar, or peripheral, to the claims in the present lawsuit or sanctions proceeding, and the second time that Gates has delayed in notifying opposing counsel. I am therefore warn-

ing Gates: in the future, upon the filing of any lawsuit against a present or former employee of Bando, in which the subject of the suit is similar or peripheral to the allegations or claims in this suit, Gates shall provide simultaneous notice to Bando of the filing of the suit, whether all information is known or not. Failure to do so will result in the imposition of sanctions.

## XII. CONCLUSION

I know of no other motions for sanctions which are presently pending in this case. If I have missed any, I trust that counsel will either bring them to my attention, or will quietly withdraw them.

I find it truly unfortunate that this case has been infected with an atmosphere of extreme suspicion and hostility. The zeal with which Gates approached its sanctions claims has caused this case to be sidetracked for several years on collateral matters, at the expense of any progress on the merits of the case. In retrospect, the sanctions proceedings were an enormous waste of time, energy and money.

All counsel share some portion of the responsibility for the degeneration of relationships between counsel into a paralysis which has made true progress on this case difficult. I hope that with the issuance of this order counsel will reflect upon the enmity and rancor which has characterized these proceedings, and will renew their commitments to approach litigation with behavior and attitudes which exemplify the highest standards of professional conduct.

## XIII. SUMMARY OF RULINGS

1. The original and supplemental Motions for Sanctions which were filed by Gates consisted of 18 claims, which were lettered A through R. Gates' Motion for Sanctions as to part 2 of the letter A (the Newman deletion of word processing files), is GRANTED. The requests for sanctions in all remaining claims are DENIED. Attorneys fees and costs are awarded as outlined below in part XIV.

2. Both parties filed motions for sanctions with regard to the Gates Marketing Strategy Document (part X above). Both motions are DENIED, and each side shall pay its own fees and costs.

3. Bando's Motion for Sanctions for Gates' failure to notify Bando of related litigation (part XI above) is DENIED. Each side shall pay its own fees and costs.

## XIV. ATTORNEYS FEES AND COSTS

I have noted earlier that it would be impossible for either Gates or Bando to determine their respective fees and costs for each separate claim in parts A through R. For example, each of the witnesses who gave testimony, either by deposition or by live testimony during the sanctions hearing, provided information which possibly related to one or several claims. No lawyer could be expected to calculate the amount of time which was spent on each witness with regard to each separate claim.

The discovery which was conducted in regard to the sanctions claims can only be described as vast, or massive. Numerous trips were made to the various Bando facilities, and to other remote cities where witnesses were located, including even trips to Japan. Huge copying costs were incurred during Gates' various site inspections, pursuant to Gates' efforts to preserve evidence from alleged destruction. To attempt to sort out the various costs which were incurred, and determine how much and to which party, each of the particular costs should be assessed in light of my findings with regard to each of the sanctions claims, would be an insurmountable task.

I find, however, that fees and costs should be awarded in this case, and I find that it is possible to reach a rough, but fair, calculation of the amount of fees which are to be assessed by determining approximate percentages of fees. I have therefore totaled the number of claims which were brought by Gates, and I have awarded fees and costs to each party according to the number of claims, according to the prevailing party for each claim and according to whether Gates lacked substantial justification in bringing each claim.

1. For prevailing on part 2 of Claim A, consisting of the Newman deletion of word processing files, Gates is awarded its fees and all related costs for that claim. The fees and costs are determined to be 10 percent of its total fees and costs which were incurred in the bringing and prosecution of claims A through R.

2. I found that Gates lacked substantial justification for the bringing of all claims with the exception of claims A, F, G, H, J and K, for a total of 6 claims. Each side shall pay its own fees and costs as to those 6 claims. Gates lacked justification with regard to 12 of 18 claims, and Bando is awarded its fees and costs for those 12 claims. I find the value of the 12 claims to be 65 percent of the total fees and costs which were incurred by Bando in its defense of claims A through R.

3. The 10 percent which is awarded to Gates is offset against the 65 percent which is awarded to Bando, for a net remainder to Bando of 55 percent (fifty-five percent). Bando is granted a total award of attorneys fees and costs of 55 percent of the total of its fees and costs which were incurred in its defense against claims A through R.

4. An award of fees and costs to Ron Newman is denied. In making this determination, I have noted that Newman faced possible sanctions on claims A (deletion of computer materials) and Q (alleged perjury agreement). To the extent Newman prevailed on claim Q, he failed to prevail on claim A, and is otherwise not deserving of an award of fees and costs.

5. Bando shall have 30 days within which to provide a statement of fees and costs to the court and to opposing counsel. Gates shall have 30 days thereafter within which to object to the reasonableness of the fees and costs. A hearing on the reasonableness of fees and costs shall be scheduled at a future date, if necessary.